## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION AT COVINGTON

| | |
|---|---|
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | Civil Action No. 2:20-cv-24-WOB-CJS |
| Plaintiffs, | |
| v. | |
| CBS NEWS INC., VIACOMCBS INC., and CBS INTERACTIVE INC. | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Jared A. Cox (KBA #92523)
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Suite 3500
Louisville, Kentucky 40202
Phone: (502) 589-4200
jared.cox@dentons.com

Natalie J. Spears (admitted *pro hac vice*)
Gregory R. Naron (admitted *pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-2481
natalie.spears@dentons.com
gregory.naron@dentons.com

Jessica Laurin Meek (admitted *pro hac vice*)
DENTONS BINGHAM GREENEBAUM LLP
10 West Market Street, Suite 2700
Indianapolis, Indiana 46204
Phone: (317) 635-8900
jessica.meek@dentons.com

*Counsel for Defendants CBS News Inc., ViacomCBS Inc. and CBS Interactive Inc.*

More than a year after the January 18, 2019 incident at the National Mall that spawned multiple lawsuits by Plaintiffs, they have filed another tranche of lawsuits, including against Defendant CBS.[1]  Plaintiffs bring a defamation *per se* claim based on a January 20, 2019 CBS online video segment ("Segment") and a corresponding CBS website article ("Article") that accompanied the segment (together, the "CBS Report").  Plaintiffs' theory of liability is that CBS, in a rush to get the story out, ignored vital context, including a full-length video of the confrontation, "in favor of its pre-conceived false narrative."  (Compl. ¶ 267.)

Ironically, it is Plaintiffs who advance a pre-conceived, cookie-cutter narrative (one indiscriminately cribbed from their prior complaints no less) that ignores the content and context of *what CBS actually published* on January 20—two days after the posting of the viral video of the confrontation on the National Mall that captivated the public's interest.  The whole premise of the CBS Report is to affirmatively *discredit* the viral video clip and provide the longer video and the very context Plaintiffs allege was missing from prior reports.  Indeed, directly contradicting Plaintiffs' Complaint are the very first seconds of the Report:  "The problem is there was another video, nearly two hours in length, most of which we have seen.  And the context it provides suggests that the story is not as originally reported."

Plaintiffs not only omit this context, but misrepresent almost all of the actual CBS Report.  Plaintiffs complain, for example, that CBS "inexcusably relied on a false, incomplete and out-of-context viral video" (*id.* ¶ 15) while repeating the "false accusation that [Sandmann] and his classmates were chanting 'Build the wall!" (*id.* ¶¶ 169, 172); and ignoring that "Phillips specifically approached the students" (*id.* ¶ 268) in order to convey that Sandmann "was the face

---

[1] The various corporate entities named in the Complaint as defendants will be referred to collectively herein as "CBS."  Neither CBS News Inc. nor ViacomCBS Inc. is properly named, though dismissal is warranted in all events for the reasons set forth herein.

of an unruly hate mob of hundreds of white, racist high school students" (*id.* ¶ 5).  But CBS did just the opposite.  While playing footage from the longer video alleged to have been ignored, the CBS correspondent explained: "We never heard the students saying, 'Build that wall.'"  Instead, "What we heard was a chant among the students that appeared to be a sports chant, right?"  And, in fact, CBS placed the blame elsewhere:  "At some point the [Black Hebrew Israelites] start yelling profanities at the high school students who were wearing the Make America Great Again hats" and "Phillips walks into the middle of the group.  Inserts himself in the situation."  The accompanying Article even includes a lengthy statement by Sandmann, including that he was "startled and confused" when Phillips approached and saying he was "grateful" to Phillips for his service.  (*Id.*, Ex. G.)

The Complaint against CBS should be dismissed.  As a threshold matter, Plaintiffs' Complaint was not filed within one year of publication as required by Kentucky's statute of limitations.  And, even if it had been, the CBS Report is not susceptible of a defamatory meaning for a number of reasons.  Initially, Plaintiffs' claim is based not on what the CBS Report actually states, but on innuendo that Plaintiffs supply—namely, an alleged implication that Sandmann was engaged in "racist misconduct."  But defamation *per se* claims cannot, as a matter of law, be based on innuendo.  Plaintiffs must base their claim on what the CBS Report actually says.  And the challenged report does not say Sandmann is a racist nor that he was engaged in racist misconduct and, in fact, dispels the factual premises from which Plaintiffs derive their legally irrelevant innuendo allegations.  Moreover, given the additional context in the CBS Report, the statements about which Plaintiffs complain also are nonactionable opinion.  Accordingly, this Complaint fails as a matter of law for a number of independent reasons.

## PROCEDURAL AND FACTUAL BACKGROUND

### A.    The Events of January 18, 2019

Having presided over Plaintiffs' other defamation lawsuits, this Court is familiar with the background "events that occurred in our nation's capital on January 19, 2019, among various groups who were exercising their rights to free assembly and speech" and that those "events quickly became the subject" of viral social media posts and reports "by major media outlets." *Sandmann v. WP Company LLC*, 401 F. Supp. 3d 781, 785 (E.D. Ky. 2019).

To recap, Plaintiff Nicholas Sandmann alleges that on January 18, 2019, he was among a group of students from Covington Catholic High School who attended the March for Life in Washington, D.C.  (Compl. ¶ 34.)  While he and his classmates were waiting at the steps of the Lincoln Memorial for buses to arrive for their return trip to Kentucky, a group of men from the Black Hebrew Israelites began yelling profanities and epithets at them.  (*Id.* ¶¶ 35–37.)  Then another group—Native Americans attending the Indigenous Peoples March on the Mall that day—approached the students, singing and dancing.  At the front of the group was Native American activist Nathan Phillips.  (*Id.* ¶¶ 39–43.)  Phillips approached Sandmann, walking up the steps of the Memorial toward him, beating his drum and ultimately stopping and singing within inches of his face.  (*Id.* ¶¶ 47–49.)  While Phillips did so, Sandmann stood silently.  (*Id.* ¶¶ 55–56.)  The encounter ended when the students were told to board their buses and left the area.  (*Id.* ¶ 62.)

That evening, Kaya Taitano, a participant in the Indigenous Peoples March, posted online two short videos showing portions of the interaction between Sandmann and Phillips.  (*Id.* ¶ 71.)  Later that night, a Twitter account tweeted a short excerpt from Taitano's videos with the comment, "This MAGA loser gleefully bothering a Native American protestor at the Indigenous Peoples March." (*Id.* ¶ 73.)  That video went "viral."  (*See id.* ¶¶ 15, 73, 75–76.)  Later that

evening, one of the Black Hebrew Israelites posted on Facebook a 1-hour 46-minute video of the incident, which Plaintiffs allege accurately depicts those events.  (*Id.* ¶¶ 79–81.)

### B.      The Previous Lawsuits and the Court's Prior Orders

Plaintiffs have "already sued The Washington Post, Cable News Network and NBCUniversal" for their reporting on the January 18, 2019 incident.  (Compl. ¶ 31.)  In their February 19, 2019 suit against The Washington Post, Plaintiffs sought "money damages in excess of Two Hundred and Fifty Million Dollars ($250,000,000.00)," which they pegged to the amount the Post's current owner paid to purchase the paper in 2013.  (*See* Compl., *Sandmann v. WP Co. LLC*, No. 2:19-cv-00019 (E.D. Ky.), Doc. 1 ¶ 19.[2])  The Washington Post moved to dismiss (*Sandmann v. WP Co.*, Doc. 27), and on July 26, 2019, this Court dismissed the complaint in its entirety.  *Sandmann v. WP Company LLC*, 401 F. Supp. 3d 781 (E.D. Ky. 2019). Thereafter, NBC moved to dismiss as well.  (*Sandmann v. NBC*, Doc. 21.)

On Plaintiffs' motion for reconsideration of The Washington Post dismissal order, the Court issued an order "adher[ing] to its previous [dismissal] rulings as they pertain" to all of the several alleged defamatory statements "**except** . . . to the extent" that certain statements in those reports state that Sandmann "'blocked' Nathan Phillips and 'would not allow him to retreat.'" (*See Sandmann v. WP Co.*, Doc. 64, p. 2 (boldface in original).)  The Court subsequently granted NBC's motion to dismiss in part, again excepting only those statements in those NBC reports that Sandmann "blocked" Phillips and "did not allow him to retreat."  (*Sandmann v. NBC*, Doc. 43, p. 3.)

---

[2] On March 12 and May 1, 2019, Plaintiffs sued CNN and NBC, seeking $275 million in compensatory and punitive damages from each.  (*See Sandmann v. Cable News Network, Inc.*, No. 2:19-cv-00031 (E.D. Ky.), Doc. 1, p. 57, and *Sandmann v. NBCUniversal*, No. 2:19-cv-00056 (E.D. Ky.), Doc. 1, p. 91.)

### C.    Plaintiffs' New Complaint Based on the CBS Report

On March 2, 2020, well over a year after the events of January 18, 2019 and the filing of

Plaintiffs' first lawsuit against The Washington Post, Plaintiffs filed their Complaint against

CBS, seeking "in excess of" $60,000,000 in compensatory and punitive damages.  (Compl. ¶¶

32–33.)  The Complaint is limited to the claim that the CBS Report is defamatory *per se* because it

accused Sandmann of "racist misconduct" by reporting that he "positioned himself," "aligned

himself," and "put[] himself in front of [Phillips]" in order to "stop[] [Phillips'] exit" from the

"January 18 Incident."  (*Id.* ¶¶ 1, 4, 70, 223, 233.)  These isolated statements, made by Phillips, are

from an interview that was part of a longer news report—a video on CBS' website on January 20,

2019 (the "Segment") and embedded in an article posted on cbsnews.com (the "Article")

(collectively, the "CBS Report").[3]  (*Id.* ¶¶ 2, 210–12.)

The Segment begins with correspondent David Begnaud framing the issue and emphasizing

that the CBS Report intends to provide additional, new context in the ongoing controversy:

> If you have been anywhere near your social media this weekend, checking in on
> your phone, you may have seen a video that shows a group of high school
> students in what appears to be a standoff with a Native American man on the
> National Mall in Washington, D.C.  ***The problem is the story as originally
> reported is incomplete.  We have more information that provides better context
> and depth to what actually happened.***  (*Id.* ¶ 217 (linked Segment); *see also* Ex.
> 1 (emphasis added).)

Specifically, Begnaud notes, the original viral video "inflamed people who said, 'How

disrespectful of this young man and the students,'" but explains that extensive additional video

---

[3] The Complaint provides a link to the Segment (Compl. ¶ 217) and to the Article, which also
contains the Segment.  (*Id.* ¶ 230.)  The Article is attached to the Complaint as Exhibit G.  For
the Court's convenience, CBS provides a transcript of the Segment, attached as Ex. 1, and
submits a DVD copy of the Segment, attached as Ex. 2.  Plaintiffs define the Segment as a
"Telephone Interview."  Consistent with Plaintiffs' strategy of ignoring all in the CBS Report
that is inconsistent with their preconceived narrative, Plaintiffs' defined term ignores that the
Segment contains much more than a telephone interview.

has surfaced and that "the context it provides suggests that the story is not as originally

reported."  (Compl. ¶ 217 (linked Segment); *see also* Ex. 1.)

Plaintiffs' Complaint emphasizes that early reports incorrectly accused the Covington

students of chanting, "Build the wall!"—a statement Plaintiffs allege that "many people consider . .

. to be racist."  (*See* Compl. ¶¶ 167–68.)  In the Segment, Begnaud states that after having watched

most of the additional two hours of videotape, **"We never heard the students saying, 'Build that**

**wall.' What we heard was a chant among the students that appeared to be a sports chant."**  (*Id.* ¶

217 (linked Segment); *see also* Ex. 1 (emphasis added).)  This is consistent with what Sandmann

said in a statement, which is extensively quoted and paraphrased in the Article.  (*See* Compl., Ex. G.)

In the Segment, Begnaud also explains, "The problem is here's how it started," pointing

to the "larger video" that Plaintiffs allege that CBS "ignored," (Compl. ¶¶ 79–83):

> *The larger video shows a group of protestors known as the Black Hebrew Israelites.*  They were protesting on the National Mall.  *At some point they start yelling profanities at the high school students* who were wearing the Make America Great Again hats.  This went on for an extended period of time.  At one point, *Mr. Phillips walks into the middle of the group. Inserts himself into the situation.*  (*Id.* ¶ 217 (linked Segment); *see also* Ex. 1 (emphasis added).)

Begnaud then says, "We wanted to talk to the students, the parents, but also Phillips."  (*Id.*)  The

Segment only then turns to an interview with Phillips, who explains that the "students weren't

really aggressive toward the indigenous people," and notes that the "young man" (Sandmann)

"didn't say nothing." (Compl. ¶ 217; *see also* Ex. 1.)  It is at this point that Phillips makes the

statement on which the Complaint is, in substantial part, based:

> He just stood in front of me, and when the others were moving aside and letting me go, he decided that he wasn't going to do that. You know, I tried to, when I was coming up the steps, I seen him start putting himself in front of me, so I slid to the right and he slid to the right. I slid to the left and he slid to the left—so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit. (Compl. ¶ 217; *see also* Ex. 1.)

6

Phillips then says, "It ended with all those students just leaving," and that he has no ill feelings toward Sandmann and that he blames "the supervisors." (*Id.*)  He adds: "The boy, he, you know, there was, there was, a couple moments in there that I thought he was gonna break down."  In response to a question from Begnaud about what Phillips would like to "happen to that young man," Phillips says he does not want anything to happen to him.

As noted, the Segment is embedded in the Article, which makes the same points and provides still additional context in the form of a statement from Sandmann.  According to the Article, "*Phillips said he inserted himself* between the students and a small group of African American protesters, known as the black Hebrew Israelites, to diffuse [*sic*] the situation."  (Compl., Ex. G.)  The Article then extensively quotes and paraphrases Sandmann's statement, which largely aligns with the very reporting about which he now complains:

> Nick Sandmann, a junior at Covington Catholic High School, said the four protestors began yelling "hateful things" at him and his classmates. He said the students began chanting school spirit chants, with their chaperones' permission, to counter the slurs being yelled at them.
>
> "The chants are commonly used at sporting events. They are all positive in nature and sound like what you would hear at any high school," Sandmann said in a statement, adding that at no point did he hear any students chanting "build that wall" or anything "hateful."
>
> Sandmann said he didn't speak to Phillips, nor did anyone block his path. He admitted he was confused as to why Phillips approached him. He said he was "startled and confused" as to why he had approached him after they were yelled at by the other protestors. Sandmann also thanked Phillips for his service and said he is "grateful to anyone who puts on the uniform to defend our nation." (*Id.*)

The Complaint, however, ignores that CBS included Sandmann's statement in the CBS Report and that Sandmann's statement lines up with the CBS Report.

## ARGUMENT

Plaintiffs' Complaint is not with the CBS Report.  It is with a report that does not exist.  The Complaint grossly distorts what CBS actually reported in a transparent attempt to force it into a narrative about the "mainstream media" portraying Sandmann as "racist" or "threatening" in the confrontation with Nathan Phillips.  The CBS Report did no such thing.  In fact, it did the opposite, taking pains to *correct* the very perceptions about which Plaintiffs complain.  Plaintiffs' belated attempt to bring CBS into their cavalcade of litigation should be swiftly laid to rest.  The Complaint is not only barred by the statute of limitations, but it is also utterly without merit.

## I.      Standard of Review

To survive a motion to dismiss, a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "Two working principles underlie" this standard.  *Id.*  First, a court need not accept as true "[t]hreadbare recitals of the elements of a cause of action," or "mere conclusory statements."  *Id.*  Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 679.  Thus, in considering a motion to dismiss, a court may begin by excluding any conclusory allegations, and then, taking only the well-pleaded facts, decide "whether they plausibly give rise to an entitlement to relief."  *Id.*

"[U]nlike in most litigation, in a libel suit the central event—the communication about which the suit has been brought—is ordinarily before the judge at the pleading stage," so the judge "may assess it upon a motion to dismiss, firsthand and in context."  2 Robert D. Sack, SACK ON DEFAMATION § 16.2.1 (5th ed. 2018).  Thus, courts, including in the Sixth Circuit, "routinely consider, on motions to dismiss . . . issues such as whether the statement at bar is capable of bearing a defamatory meaning . . . and they frequently grant motions on these grounds and others."  *Id.*; *see,*

*e.g.*, *Croce v. N.Y. Times Co.*, 930 F.3d 787, 797 (6th Cir. 2019); *Doe v. Univ. of Dayton*, 766 F. App'x 275, 290 (6th Cir. 2019); *Ohnemus v. Thompson*, 594 F. App'x 864, 869 (6th Cir. 2014).

## II.      Plaintiffs' Complaint Is Barred by the Statute of Limitations

Initially, the Complaint should be dismissed because Plaintiffs did not bring their action within the one-year statute of limitations for defamation claims.  KRS 413.140(1)(d).  The limitations period here expired on January 20, 2020, yet, Plaintiffs filed this Complaint on March 2, 2020.  Where "a person entitled to bring" a defamation action is an infant "at the time the cause of action accrued," the claim "may be brought within the same number of years after the removal of the disability or death of the person."  *See* KRS 413.170(1).  The Kentucky Court of Appeals, however, has held that this tolling provision does not apply to minor plaintiffs like Sandmann who have actively litigated their claims.  *See Tallman v. City of Elizabethtown*, No. 2006-CA-002542-MR, 2007 Ky. App. Unpub. LEXIS 835, *8–9 (Ky. Ct. App. Nov. 2, 2007).

In *Tallman*, plaintiffs, a decedent's estate and minor children, filed federal and state law claims arising from a fatal police shooting.  *Id.* at *2.  The district court dismissed with prejudice the federal claims and dismissed without prejudice the state law claims, and the Sixth Circuit affirmed.  *Id.* at *2–3.  Then after the limitations period had run, the estate filed a wrongful death action in state court, and the minors filed claims for loss of parental consortium.  *Id.* at *3.  The trial court granted summary judgment for defendants, and the plaintiffs raised "several issues" on appeal.  *Id.* at *4.  "[A]fter thoroughly considering all of the arguments and relevant case law," the Kentucky Court of Appeals concluded that it need "only address the statute of limitations issue because it is dispositive to this appeal."  *Id.*  After recounting the plaintiffs' legal history in federal and state courts, the court found the minors' claims time-barred:

> The Estate contends that KRS 413.170(1) tolls the limitations period of a minor's state law claim until the minor reaches majority.  Here, however, the children's claims were prosecuted on their behalf by their mother, as guardian and next

> friend.  In light of the procedural history of this case, we are not persuaded that KRS 413.170(1) tolled the children's claims, and the Estate offers no other authority to support its position.  Consequently, we find this argument to be without merit.

*Id.* at *8–9.  The Kentucky Supreme Court denied the plaintiffs' request for discretionary review.  *Tallman v. City of Elizabethtown*, 2008 Ky. LEXIS 620 (Ky. Ct. App. Sept. 10, 2008).

*Tallman* is Kentucky law.  One of the law's fundamental maxims "is that 'when the reason ceases the law ceases.'"  *Lowther v. Moss*, 39 S.W.2d 501, 503 (Ky. 1931).  Thus, KRS 446.080(1) requires that "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature."  The object of tolling provisions such as KRS 413.170 is to protect parties with incapacities who cannot sue, so they can sue when the incapacity is removed.  Where these interests are not advanced, the statute's protections cease.  *See Lowther*, 39 S.W.2d at 503 (where "the reason for complying with [Code] provisions . . . does not exist, because the purpose of the Legislature in enacting the Code rule . . . was complied with," the rule's "requirements would also necessarily cease"); *cf. Asher v. Hartlage*, 336 S.W.2d 335, 337–38 (Ky. Ct. App. 1960) (where grantor found "mentally competent," the "reason for the rule" that grantor's "mental weakness" shifts the burden to the grantee "ceases to exist and it has no application").

The same logic applies here.  The purpose of the tolling statute has no application given the "procedural history of this case."  *Tallman*, 2007 Ky. App. Unpub. LEXIS 835, at *8–9.  On the contrary, Plaintiffs have been litigating claims arising out of the confrontation on the National Mall since February 2019.  (Compl. ¶ 31.)  At no time within the limitations period, however, did they choose to litigate against CBS.  Just as the minors in *Tallman* could not aggressively litigate their case in federal court, and, then, when presented with an adverse result, file in state court with the protection of the tolling statute, Plaintiffs cannot aggressively litigate their case in this Court, and, then, when presented with a beneficial result, sue *still more*

defendants after the one-year limitations period.  The tolling statute is meant to protect minors who cannot litigate, not minors pursuing creative litigation strategies.  Because Plaintiffs clearly are capable of pursuing their claims—and, indeed, did so—this late Complaint is time barred.

Despite *Tallman*'s application to cases like this one, several federal district courts have rejected it.[4]  This Court should not follow suit.  The rule in this Circuit is clear: "a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court."  *Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993) (citation omitted); *Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 932 (6th Cir. 2020).  This is true "even though [the federal court] thinks the rule is unsound in principle or that another is preferable," *Mroz*, 5 F.3d at 1019, because "[a]fter a state supreme court's decisions, 'intermediate state appellate court decisions constitute the next best indicia of what state law is.'"  *U.S. v. Burris*, 912 F.3d 386, 398 (6th Cir. 2019) (citation omitted).[5]  A federal court may only depart from an intermediate appellate court's ruling where "it is convinced"—not by its own reasoning—but by "*persuasive data* that the highest court of the state would decide otherwise."[6]  *Mroz*, 5 F. 3d at 1019 (emphasis added).  The courts that rejected *Tallman* erred in doing so merely because they did not find it persuasive.[7]

---

[4] *See Newton v. Dennison*, No. 4:14-CV-15-JHM, 2014 U.S. Dist. LEXIS 104594, *6 (W.D. Ky. July 30, 2014); *Bradford v. Bracken Cnty.*, 767 F. Supp. 2d 740, 752 (E.D. Ky. 2011); *T.S. v. Doe*, No. 5:10-CV-217-KSF, 2010 U.S. Dist. LEXIS 107088, *12 (E.D. Ky. Oct. 6, 2010); *see also Martin v. Celadon Trucking Servs.*, *Inc.*, No. 5:05-CV-00101-R, 2006 U.S. Dist. LEXIS 4923, *2 (W.D. Ky. Jan. 17, 2006).

[5] *See, e.g.*, *Davis v. Marriott Int'l, Inc.*, No. 04-4156, 2005 U.S. App. LEXIS 21789, at *7–8 (6th Cir. Oct. 4, 2005) (finding court "obliged" to follow the "[o]ne Ohio intermediate appellate court [that] ha[d] addressed this precise issue"); *Matulin v. Lodi*, 862 F.2d 609, 616 (6th Cir. 1988) (same); *see also West v. Am. Tel. & Tel. Co*., 311 U.S. 223, 236–37 (1940) (reversing the Sixth Circuit's rejection of a single state intermediate appellate court ruling that it thought "unsound").

[6] This is true even whether or not a decision is published.  *Aarti Hospitality, LLC v. Grove City*, 350 F. App'x 1, 8 (6th Cir. 2009).

[7] *See Bradford*, 767 F. Supp. 2d at 753; *Newton*, 2014 U.S. Dist. LEXIS 104594, at *7; *T.S.*, 2010 U.S. Dist. LEXIS 107088, at *11–12.

When the proper principles are followed, no data demonstrates that the Kentucky Supreme Court would disagree with *Tallman*, and, thus, *Tallman* controls. First and foremost, the Kentucky Supreme Court *did not disagree with Tallman*; it denied discretionary review of the case altogether. *See Lukas v. McPeak*, 730 F.3d 635, 638 (6th Cir. 2013) (holding intermediate appellate court precedent "particularly persuasive" where the state supreme court "refused to review the decision"). As another district court in this Circuit observed last year, the "binding effect of [a] state appellate decision on [a] federal court making an *Erie* 'guess' is greater where [the] state's highest court has refused to review that decision." *Deane v. Quest Diagnostics Inc.*, No. 1:18-cv-880, 2019 U.S. Dist. LEXIS 103908, at *3 (S.D. Ohio June 21, 2019) (Bertlesman, J.).

Moreover, there is no countervailing Kentucky Supreme Court precedent requiring the rejection of *Tallman*. While one federal court rejected *Tallman* based on a 1939 Kentucky Supreme Court case, that case does not undercut *Tallman*. *See T.S.*, 2010 U.S. Dist. LEXIS 107088, at *9–12 (citing *Newby's Adm'r v. Warren's Adm'r*, 227 Ky. 338, 126 S.W.2d 436 (1939)). In *Newby*, the question was whether the "*right to proceed* by a next friend" removed the protections of the tolling statute for a person of unsound mind. 227 Ky. at 342 (emphasis added). The court found it did not. *Id.* In contrast to the *Newby* plaintiff's hypothetical *right to proceed* by a next friend, *Tallman* addressed whether a minor who had *actually proceeded* by a next friend could still claim the protections of the statute. *Tallman*, at *8–9.[8] *Tallman* answered that question "*No*."

Because *Tallman* is directly on point and there is no data—let alone "persuasive data"— that the Kentucky Supreme Court would disagree, the Complaint should be dismissed.

---

[8] In any event, Newby was construed under a prior rule requiring strict construction of statutes of limitation that was superseded by the modern rule of construction enunciated in KRS 446.080(1). *Plaza Bottle Shop, Inc. v. Al Torstrick Ins. Ag., Inc.*, 712 S.W.2d 349, 351 (Ky. Ct. App. 1986).

III.   **The CBS Report Is Not Susceptible of the Defamatory Meaning Alleged**

A.   **Determining Whether a Statement Is Defamatory Depends Crucially on the Specific Context of the Particular Defendants' Publication**

No word nor phrase is always defamatory as a matter of law.  In the law of defamation, precise words matter, and context matters even more.  Because the same words in different contexts may lend themselves to drastically different meanings, each publication complained of in a defamation lawsuit (or series of defamation lawsuits against different defendants) must be assessed *in its own context* separate from the words and context of every other publication.

Kentucky law thus requires courts to assess at the outset whether the particular statements targeted by defamation plaintiffs are, in context, reasonably susceptible to the defamatory meaning alleged.  *See, e.g.*, *Sandmann*, 401 F. Supp. 3d at 790 ("[T]he Court must 'analyze the article in its entirety and determine if its gist or sting is defamatory.'") (quoting *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981)); *Chatterjee v. CBS Corp.*, No. 6:19-CV-212-REW, 2020 U.S. Dist. LEXIS 20346, at *13 (E.D. Ky. Feb. 6, 2020) ("[E]ach remark has a context within the story, which the Court must account for.").  Courts cannot ignore specific contexts of specific publications in determining whether a statement can reasonably be read as imparting a defamatory meaning.

Entirely separate from that substantive rule of defamation law, Rule 12(b)(6) also requires that courts apply a context-specific approach in determining whether a complaint (whether it alleges defamation or some other claim) plausibly states a claim for relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task.").  Thus, on a motion to dismiss, courts must assess whether a plaintiff has pleaded sufficient "factual content that allows the court to draw the

reasonable inference that *the defendant* is liable for the misconduct alleged." *Id*. at 678 (emphasis added).

Consistent with that requirement, courts must separately assess allegations made against *each defendant* to ensure they are well-pleaded in light of the unique facts and circumstances pertaining to them. *See, e.g.*, *id.* at 682–83; *Taylor v. Popeye's Chicken*, No. 2:19-138-WOB, 2019 U.S. Dist. LEXIS 175334, at *3 (E.D. Ky. Oct. 9, 2019) (dismissing complaint that did not "explain[] specifically what *each defendant* did or failed to do to cause him harm" (emphasis added)). Thus, a finding on a Rule 12(b)(6) motion that one defendant's publication is susceptible of the defamatory meaning alleged, does not—and cannot under the Federal Rules— foreclose the question as to whether another defendant's different publication is also susceptible of defamatory meaning.

CBS understands that this Court most recently found that NBC's motion to dismiss "must be granted in part and denied in part for the same reasons discussed in the two related pending cases"—that is, denied to the extent that the NBC reports, like The Washington Post and CNN reports before it, included allegations by Nathan Phillips that Sandmann "blocked" Phillips and did not "allow him to retreat." *Sandmann v. NBC*, Doc. 43. CBS does not believe that, by this ruling, the Court intended a "one-size-fits-all" approach to the various defendants' publications that would overlook not only the specific words, but also crucial context of the respective publications. Again, each defendant's publication—and motion to dismiss—must be assessed on its own terms. Properly applying that individualized approach, the Complaint filed against CBS here must be dismissed.

14

**B.     The CBS Report Should Be Considered in Its Entirety on This Motion**

The entirety of the CBS Report should be considered on this Motion.  The Article, as an exhibit to Plaintiffs' Complaint, is a part of the pleading itself.  (*See* Compl., Ex. G.)  While Plaintiffs also pleaded that the Article contains the Segment embedded in it (*id*. ¶ 231), they did not attach a hard copy of the Segment as an Exhibit.  Nevertheless, they have directed the Court to a copy of the Segment available online, quoted extensively from it, reproduced photograph stills of it, and do not question its authenticity.  (*Id*. ¶¶ 217, 221, 223.)[9]  And, of course, the Segment is central to their claim; indeed, like the Article, it is the basis of it.  (*Id.* ¶ 211.)  As such, having "reference[d] or quote[d]" the Segment, it too is part of the pleadings, and the entirety of the CBS Report is properly before the Court.  *Sandmann*, 401 F. Supp. 3d at 787.[10]

Because Kentucky law requires courts to consider the entire context of a challenged report, it is appropriate—indeed, necessary—for the Court to consider the CBS Report for itself in its entirety (rather than Plaintiffs' characterizations) on a motion to dismiss.  *See Chatterjee*, 2020 U.S. Dist. LEXIS 20346, at *13.  As the Sixth Circuit explained in another defamation lawsuit, "[a]lthough a court must view all facts in the light most favorable to the plaintiff at this stage, the [challenged] article also speaks for itself.  Consequently, 'if a factual assertion in the pleadings is inconsistent with a document attached for support,' a court is not bound to accept as

---

[9] As Plaintiffs recognize, "CBSN published the CBSN Telephone Interview on January 20, 2019" and it "is still publicly available online and can be viewed by the Court at https://www.cbsnews.com/news/native-american-veteran-nathan-phillips-viral-video-confrontation-speaks-out-covington-catholic-high-school-students/ (last accessed Feb. 28, 2020)."  (Compl. ¶ 217.)

[10] *See also Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017) ("[C]ourts have considered videos when granting motions to dismiss."); *Chatterjee*, 2020 U.S. Dist. LEXIS 20346, at *13 (proper to consider on motion to dismiss defamation claims "the actual recording of the broadcast (provided by Defendants on a DVD)" that "go[es] to the heart of Plaintiffs' claims").

true the plaintiff's factual allegation." *Croce*, 930 F.3d at 792 (citation omitted); *see also Sandmann*, 401 F. Supp. 3d at 787.

This is especially necessary here as Plaintiffs' characterizations of the CBS Report are borderline frivolous. In fact, Plaintiffs' allegations "contradict verifiable facts central to [their] claim[]," as evidenced by the CBS Report. *Bailey*, 860 F.3d at 387. By definition, the Sixth Circuit has explained, this "makes [their] allegations implausible" on a motion to dismiss. *Id.*

For example, Plaintiffs' entire Complaint is predicated on the false premise that CBS "failed to provide . . . a complete picture of the January 18 Incident" and "inexcusably relied on a false, incomplete and out-of-context viral video" (Compl. ¶¶ 15, 251), while "ignor[ing] . . . contrary information" (*id.* ¶ 267), including ignoring the full-length video that showed the "truth" (*id.* ¶¶ 16, 82, 250); repeating the "false accusation that [Sandmann] and his classmates were chanting 'Build the wall!'" (*id.* ¶¶ 169, 172); downplaying that the Black Hebrew Israelites were "shouting homophobic and racial epithets" at the students (*id.* ¶ 226); ignoring Sandmann's own statements (*id.* ¶ 271); and ignoring that "Phillips specifically approached the students" (*id.* ¶ 268).

But the CBS Report, both as evidenced by the Article and the embedded Segment, directly contradicts *all* of these allegations. The very premise of the CBS Report was that "*the story, as originally reported [on social media and elsewhere] is incomplete*. We have more information that provides better context and depth to what actually happened." (Compl. ¶ 217 (linked Segment); *see also* Ex. 1 hereto (emphasis added).) That "better context," as reported by CBS, included (contrary to the Complaint) that "there was another video nearly two hours in length . . . [a]nd the context it provides suggests that the story is not as originally reported" (Compl. ¶ 217 (linked Segment); *see also* Ex. 1 hereto (emphasis added); that CBS "*never heard*

*the students saying, 'Build that wall'"* (Compl. ¶ 217 (linked Segment) and Ex. G (Sandmann stating that "at no point did he hear any students chanting 'build that wall' or anything 'hateful'"); that the Black Hebrew Israelites "yell[ed] profanities at the high school students" (Compl. ¶ 217 (linked Segment); *see also* Ex. 1 hereto); that Sandmann maintained he did nothing wrong, (Compl., Ex. G); and that it was Phillips who "inserted himself" in front of Sandmann (*id.* ¶ 217 (linked Segment) and Ex. G).[11]

Because Plaintiffs' allegations are so contradicted by their own exhibit of the Article and the Segment—that is, the actual CBS Report—*none* of these allegations can be accepted as "plausible" on this motion.  *Bailey*, 860 F.3d at 386–87; *Croce*, 930 F.3d at 792.  The CBS Report disclaims the "false narrative" on which Plaintiffs base their claim, and Plaintiffs should not be permitted to evade an early motion by manufacturing in their pleading a report that does not exist.

**C.     The CBS Report Is Not Actionable as Defamation *Per Se***

**1.     Innuendo Cannot Support Plaintiffs' Defamation *Per Se* Claim**

To support their defamation *per se* claim, Plaintiffs cannot rely on the tens of pages of innuendo laid out in their brief—almost all of which has nothing to do with the CBS Report itself.  First, Kentucky law does not allow defamation *per se* claims to be based on innuendo; they must be based on what the challenged statements *actually say*.[12]  Second, even if it did,

---

[11] Other allegations are just factually incorrect, *e.g.*, that CBS published the CBS Report on January 19 (Compl. ¶ 83), was "among the first members of the broadcast and online mainstream media to assassinate Nicholas' character and reputation" (*id.* ¶ 159), and "repeatedly referenced, embedded and displayed a short clip from the Taitano Videos" (*id.* ¶ 213), and appear to be careless and mistaken repetitions of allegations arising from other reports by other defendants.
[12] Because they have properly pleaded special damages, Plaintiffs have no claim for libel per quod or libel by implication.  *See Sweeney & Co. v. Brown*, 60 S.W.2d 381, 384 (Ky. 1933).

Plaintiffs' allegations as to the purported innuendo of the CBS Report should not be accepted as true by this Court because they are directly contradicted by the CBS Report itself.

On the first point, "[w]hether a particular communication is actionable *per se* is a question of law to be determined by the courts." *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003). A defamation *per se* claim must be based solely on the words of the complained of report itself. *See id.* The words must be "'stripped of all innuendo, colloquium, and explanatory circumstances.'" *Id.* (quoting *Sweeney & Co.*, 60 S.W.2d at 384). Thus, Plaintiffs' claim must rest exclusively on of the *actual words* of the CBS Report "given their ordinary, natural meaning as defined by the average lay person." *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006). Colloquially, defamation *per se* does not permit reading between the lines. *See Sandmann*, 401 F. Supp. 3d at 794 ("The face of the writing must be stripped of all innuendoes and explanations." (marks and citations omitted)).

Here, Plaintiffs' Complaint has precious little to do with the actual words of the CBS Report as opposed to manufactured innuendo that is not cognizable in the defamation *per se* context. Plaintiffs spend paragraph after paragraph setting up "explanatory circumstances" in a futile attempt to make the CBS Report defamatory *per se* insofar as it allegedly casts Sandmann as engaging in racist misconduct. They then use that false premise to plead not that CBS called Sandmann a racist, but that "the false and defamatory *gist*" of the CBS Report was that he "was the face of an unruly hate mob of hundreds of white, racist high school students who physically assaulted and harassed Native Americans." (Compl. ¶ 5 (emphasis added); *see also id.* ¶ 225 (stating that the CBS Report "imputes" to Sandmann "racist conduct," including (1) "aggression constituting and intent-to-intimidate assault against Phillips, a Native American elder and veteran"; (2) "menacing racial intimidation of Phillips," and (3) "a hate crime for interfering with

18

a Native American prayer and song").)  But, again, this is Plaintiffs' construction, not what the CBS Report actually states, as it must be under Kentucky law.

Even if, under Kentucky law, Plaintiffs could rely on the alleged innuendo behind the CBS Report to support a defamation *per se* claim, this innuendo still cannot save Plaintiffs' Complaint because it is plainly contradicted by the actual CBS Report, which controls here.  *See, e.g.*, *Sandmann*, 401 F. Supp. 3d at 787; *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012).  To be clear, this is not a question of the Court construing the allegations of the Complaint in favor of Plaintiffs but to suspend disbelief altogether, a leap the Federal Rules do not require.  *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience *and common sense*." (emphasis added)).

Plaintiffs, for example, divine racist undertones in the CBS Report based on allegations that it reports that Sandmann and the other students were chanting, "Build the wall!" (Compl. ¶ 167 ("[I]t was well-known at the time CBSN published its False and Defamatory Publications, that many people consider chanting "Build the wall!" to be racist."); *id.* ¶ 169)).  But these allegations need not be credited, as the CBS Report actually ***debunked the assertion that the students chanted "Build the wall!"***: "We never heard the students saying 'Build that wall.' What we heard was a chant among the students that appears to be a sports chant."  (*Id.* ¶ 217 (linked Segment) and Ex. G ("Sandmann said in a statement . . . at no point did he hear any students chanting 'build that wall' or anything 'hateful.'").)

Plaintiffs' other purported indicia of racist undertones in the CBS Report fare no better. Plaintiffs, for example, point to CBS failing to "focus[] their attention on the Black Hebrew Israelites, who had been relentlessly hurling insults at both the teenagers for almost an hour."

19

(*Id.* ¶¶ 41; *see also id.* ¶¶ 226, 270.) But, again, CBS actually ***did report that it was the Black Hebrew Israelites yelling slurs at the students, not the other way around***: "The larger video shows a group of protesters known as the Black Hebrew Israelites. They were protesting on the National Mall. At some point they start yelling profanities at the high school students who were wearing the Make America Great Again hats. This went on for an extended period of time." (*Id.* ¶ 217 (linked Segment); *id.*, Ex. G. ("Nick Sandmann, a junior at Covington Catholic High School, said the four [Black Hebrew Israelites] protesters began yelling 'hateful things' at him and his classmates. He said the students began chanting school spirit chants . . . to counter the slurs being yelled at them.").)

In short, even if Plaintiffs could rely on innuendo to support their defamation *per se* claim, which they cannot, the CBS Report cannot, as a matter of law, reasonably be construed as accusing Sandmann of "racist conduct" (*id.* ¶ 169) or that he "was the face of an unruly hate mob of hundreds of white, racist high school students" (*id.* ¶ 5). If anything, CBS dispels the allegations that Plaintiffs offer to support the alleged racist undertones of the CBS Report and is actually sympathetic to Plaintiffs' complaints that earlier reporting on social media and elsewhere failed to capture the full context of the confrontation that the CBS Report exposes.

### 2. What the CBS Report Actually Says Is Not Defamatory

Stripped as required by Kentucky law of Plaintiffs' laden innuendo, Plaintiffs are left to base the their $60 million defamation *per se* claim against CBS on the following statement: "[W]hen the others were moving aside and letting me go, he decided that he wasn't going to do that. . . . [W]hen I was coming up the steps, I seen him start putting himself in front of me so I slid to the right, and he slid to the right. I slid to the left and he slid to the left—so by

20

the time I got up to him, we were right in front of him.  He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit."  (*Id.* ¶ 217 (linked Segment).)[13]

Divorced from the innuendo, this is simply not the stuff of a defamation *per se* claim.  As this Court has held, while "[Kentucky] common law treats a broad[] class of written defamatory statements as actionable per se," *Sandmann*, 401 F. Supp. 3d at 790, not every allegation that a plaintiff acted "unwisely or foolishly" is defamatory *per se*.  *Digest Publ'g Co. v. Perry Publ'g Co.*, 284 S.W.2d 832, 835 (Ky. 1955).  Instead, the challenged statements must "tend to expose [Sandmann] to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people," or "impugn [his] competence, capacity, or fitness in the performance of his profession."  *Sandmann*, 401 F. Supp. 3d at 790 (citations omitted).  It is settled law that a "defamatory statement is measured by looking at the publication as a whole to gauge the effect on the average reader."  *Peavey v. Univ. of Louisville*, 834 F. Supp. 2d 620, 629 (W.D. Ky. 2011) (citation omitted).

Applying these rules, this Court has catalogued the kinds of statements Kentucky courts have found to be defamatory *per se*: accusing an attorney of "fix[ing] the cases" or "brib[ing] a judge"; or a judge of "fraudulent[ly] obtaining . . . public money"; that employees "had been fired for stealing" or "for an integrity issue"; or that they engaged in a "sexual liaison" with a co-worker and "misappropriated" funds; that hotel employees were involved in a hotel robbery; that

---

[13] Plaintiffs apparently disagree as to whether Phillips said "sort of stopped my exit" or "stopped my exit."  (*See* Compl. ¶ 233 (quoting Article: "He just positioned himself to make sure that he aligned himself with me, so that *sort of [sic]* stopped my exit." (emphasis added).); *cf. id.* ¶ 223 (quoting Segment: "He just positioned himself to make sure he aligned himself with me *so that he* stopped my exit.") (emphasis added).)  Plaintiffs, however, do not get to rewrite what CBS actually reported in the Article.  At any rate, whether or not Mr. Phillips said "stopped" or "sort of stopped" does not affect whether Plaintiffs' claim is subject to dismissal.

a taxicab driver was "discharged for drinking"; and that a minor had "pounded" another child's

head "over and over again against the pavement." *Sandmann*, 401 F. Supp. 3d at 795; n. 14.

Plaintiffs' complaints about the words that Sandmann "stopped" Phillips, or that he

"positioned himself," "aligned himself," "put[] himself in front of" him are not remotely in the

same ballpark. (Compl. ¶ 4); *cf., e.g.*, *Roche*, 197 F. App'x at 399 (allegation that coworker

"feels harassed" by plaintiff and "want[ed] no contact" is not defamatory per se). There is

nothing inherently defamatory about these words as required, nor can it seriously be argued

(even if the Court permitted Plaintiffs to resort to innuendo to support a defamation *per se* claim)

that these words impute racist misconduct to Sandmann. There can be no doubt about this as the

very purpose of the CBS Report is to highlight the "problem" with the initial narrative on social

media and elsewhere. It aimed to *correct* that problem by including substantial context

discrediting the original narrative, in original reporting and in additional video of the encounter

(and, in the case of the Article, reciting Sandmann's views *at length*).[14]

In fact, far from clearing the bar of being defamatory *per se*, Plaintiffs' Complaint does

not even clear the bar set for them by this Court. The Court gave Plaintiffs leave to identify "any

additional lawsuit(s) that he expects to file in this Court concerning a republication of the

statements of Nathan Phillips that Sandmann 'blocked' Phillips and 'would not allow him to

retreat.'" (Agreed Order, *Sandmann v. WP Co.*, No. 2:19-cv-00019, Doc. 74 (Jan. 15, 2020).)

CBS *never reported* that Phillips "blocked" his exit or "would not allow him to retreat." But

here, in describing and displaying footage from the longer video, CBS reported that Phillips

---

[14] To the extent Plaintiffs' position is that CBS should simply *not have spoken* to Phillips, that position is legally and commonsensically untenable. The law credits the idea that reporters should speak to all parties involved, and, it is just good journalism to do so. *See, e.g.*, *Croce*, 930 F.3d at 793 (describing non-actionable news article "as a standard piece of investigative journalism that presents newsworthy allegations made by others").

"*inserted himself* between the students and a small group of African American protesters," that he thought Sandmann was going to "break down," and further that the confrontation ended by Sandmann and the students "just leaving."  (Compl. ¶ 217 (linked Segment) and Ex. G.)

Plaintiffs' attempt to shoehorn the CBS Report into the Court's order by cherry-picking language from the interview with Phillips ("aligned"; "positioned"; "stopped") is in vain.  In a tacit admission that this language cannot support a defamation *per se* action, Plaintiffs can only resort to (again) twisting those words, through improper and histrionic innuendo, into a defamatory accusation of "aggression constituting an intent-to-intimidate assault" and "menacing racial intimidation of Phillips."  (Compl. ¶ 225.)  As shown, Plaintiffs' allegations are unfounded given the CBS Report's actual words and context, not least that it was Phillips who "inserted himself" into the situation and approached a nervous Sandmann.  *Roche*, 197 F. App'x at 399. At most, Phillips says that Sandmann moved from side to side and then stood silently in front of him, at times looking emotionally distraught (he thought Sandmann was going to "break down"). (Compl. ¶ 217 (linked Segment).)  Phillips says that the encounter lasted all of three minutes; that the "students **weren't really aggressive toward the indigenous people**"; and that encounter ended by Sandmann and the students "just leaving."  (*Id.* (emphasis added).)  There is absolutely no intimation that Phillips was seriously threatened by Sandmann in any way.

In the end, to the extent Plaintiffs' Complaint is with the CBS Report at all, it appears limited to the fact that in addition to *all of its other reporting* there, CBS *also* included an interview of a main participant in the controversy who stated, from his perspective, that he was "stopped" by Sandmann.  (*Id.*  ¶¶ 103–158.)  Plaintiffs assert that CBS cannot publish such a report—a report from each side's perspective as to what happened during events that created a national controversy—without risk of a defamation lawsuit.  That is not the law, and it is not the

law especially when applied to a balanced report like the CBS Report.  *Croce*, 930 F.3d at 794

("[S]tating that there are allegations against someone and raising these concerns does not

necessarily imply guilt.").  Because no reasonable reader would view the CBS Report as

defamatory *per se* under any theory advanced by Plaintiffs, the Complaint should be dismissed

with prejudice.

## IV.    The Defamatory Meaning Alleged Is Non-Actionable Opinion

As this Court has rightly emphasized, "[f]ew principles of law are as well-established as the

rule that statements of opinion are not actionable in libel actions"—a rule "based on the right to

freedom of speech in the First Amendment to the United States Constitution," and one the Court is

versed in.  *Sandmann*, 401 F. Supp. 3d at 791.  A statement is nonactionable as "[p]ure opinion"

where "the commentator states the facts on which the opinion is based, or where both parties to

the communication know or assume the exclusive facts on which the comment is based."

*Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 881–82 (E.D. Ky. 2006) (woman's statement that her

ex-husband committed adultery was protected opinion because facts on which she based that

statement were disclosed in the publication at issue), *aff'd*, 280 F. App'x 503 (6th Cir. 2008); *see

also Loftus v. Nazari*, 21 F. Supp. 3d 849, 853 (E.D. Ky. 2014).  As with defamatory meaning,

when considering whether a challenged statement is an actionable statement of fact, a court must

assess the statement in its complete context.  *Lassiter*, 456 F. Supp. 2d at 881.

Here, Plaintiffs allege that CBS defamed Sandmann by alleging that he was engaged in

"racist misconduct" based on Phillips' statement that Sandmann "stopped" him.  (Compl. ¶¶ 1,

4.)  Even if the CBS Report could be so construed (and, for all the foregoing reasons, it cannot),

this would still be a non-actionable opinion because CBS disclosed all the facts relating to the

underlying confrontation, including how it started and how it ended, in the form of video

evidence beyond the viral video, CBS' own reporting, and both Phillips' and Sandmann's

statements.  (*Id.* ¶ 217 (linked Segment); *id.*, Ex. G).  Moreover, CBS did "not imply the existence of any undisclosed facts."  *Loftus*, 21 F. Supp. 3d at 853.  As such, the reader can "decide for himself or herself whether the opinions should be accepted" based on the facts laid out at length in the CBS Report.  *Id.*  In light of this substantial additional context provided by CBS to correct the "problem" with the original narrative, "the reader was in as good a position as Phillips to judge whether the conclusion he reached" about being "stopped" was correct and *further* whether it was motivated by racial animus, as required to support Plaintiffs' defamation claim.[15]  *See Sandmann*, 401 F. Supp. 3d at 793.  Because Plaintiffs cannot demonstrate that the underlying allegation that Sandmann engaged in racist misconduct is provably false, Plaintiffs' Complaint should also be dismissed with prejudice because it is based on non-actionable opinion.

## CONCLUSION

For the foregoing reasons, CBS respectfully requests that the Court grant its motion and dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

*/s/ Jared A. Cox*
Jared A. Cox (KBA #92523)
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Suite 3500
Louisville, Kentucky 40202

---

[15] Importantly, Plaintiffs' defamation *per se* claim is not based on the allegation that Sandmann "stopped" Phillips but on the allegation that *his doing so amounted to racist misconduct*.  *See, e.g.*, *Squitieri v. Piedmont Airlines, Inc.*, 2018 WL 934829, No. 3:17CV441, at *4 (W.D.N.C. Feb. 16, 2018) (collecting cases where courts considering "accusations of bigotry or racism have held the statements to be nonactionable statements of opinion"); *Murray v. HuffingtonPost.com, Inc.*, 21 F. Supp. 3d 879, 886 (S.D. Ohio 2014) (rejecting "Plaintiffs' argument that expressions of another's motivation are verifiable").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 27, 2020, I electronically filed the foregoing MEMORANDUM IN SUPPORT OF MOTION TO DISMISS via the CM/ECF system, which will send notice of filing to all parties of record.

<u>/s/ Jared A. Cox</u>
Jared A. Cox