# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### AT COVINGTON

| | | |
|---|---|---|
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:20-cv-00024-WOB-CJS |
| v. | ) ) | |
| CBS NEWS, INC., d/b/a CBSN, VIACOMCBS, INC., and CBS INTERACTIVE, INC. | ) ) ) ) | ORAL ARGUMENT REQUESTED |
| Defendants. | ) ) | |

## CBS DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Jared A. Cox (KBA #92523)
Dentons Bingham Greenebaum LLP
101 South Fifth Street, Suite 3500
Louisville, Kentucky 40202
Phone: (502) 589-4200
jared.cox@dentons.com

Natalie J. Spears (pro hac vice)
Gregory R. Naron (pro hac vice)
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com

Jessica Laurin Meek (pro hac vice)
Dentons Bingham Greenebaum LLP
10 West Market Street, Suite 2700
Indianapolis, Indiana 46204
Phone: (317) 635-8900
jessica.meek@dentons.com

Counsel for Defendants CBS News Inc.,
ViacomCBS Inc., and CBS Interactive Inc.

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES ............................................................................ ii

STATEMENT OF FACTS ................................................................................ 2

      A.    The Early Reports and the Later CBS Report ............................................ 2

      B.    The Complaint's Allegations Bear No Resemblance to the Actual CBS Report ....................................................................................... 5

ARGUMENT ................................................................................................... 6

    I.    Phillips' Statements to CBS Are Nonactionable Opinion .................... 7

      A.    Phillips' Statements to CBS Reflected His Perception of the Encounter ....................................................................................... 8

      B.    Phillips' Perception Is Supported by Sandmann's Own Admissions, and the Disclosed Facts and Context in the CBS Report Confirms It Is Opinion ....................................................................................... 9

    II.    Sandmann Cannot Meet His Burden of Proving Material Falsity ........................ 11

    III.    The CBS Report Dispels Sandmann's Invented Defamatory Meaning .............. 13

CONCLUSION ............................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Wisc. Airlines Corp. v. Hoeper*,
  571 U.S. 237 (2014) .................................................................12

*Better Built Garages, Inc. v. Kentucky New Era, Inc.*,
  2008 WL 4531037 (Ky. Ct. App. Oct. 10, 2008) ...................15

*Cromity v. Meiners*,
  494 S.W.3d 499 (Ky. Ct. App. 2015) ....................................7

*Dermody v. Presbyterian Church (U.S.A.)*,
  530 S.W.3d 467 (Ky. Ct. App. 2017) ....................................13

*Estepp v. Johnson County Newspapers, Inc.*,
  578 S.W.3d 740 (Ky. Ct. App. 2019) ...................................13

*Friskey v. Bracke*,
  2020 WL 465026 (E.D. Ky. Jan. 28, 2020) (Bertelsman, J.) ................14

*Greenbelt Co-op. Publ'g Ass'n v. Bresler*,
  398 U.S. 6 (1970) ..................................................................14

*Haynes v. Alfred A. Knopf, Inc.*,
  8 F.3d 1222 (7th Cir. 1993) ............................................7, 8

*Lassiter v. Lassiter*,
  456 F. Supp. 2d 876 (E.D. Ky. 2006), *aff'd*, 280 F. App'x 503 (6th Cir. 2008) ...................11

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
  838 F.2d 1287 (D.C. Cir. 1988) ..........................................7

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991) .............................................................13

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) ..................................................................7

*Orr v. Argus-Press Co.*,
  586 F.2d 1108 (6th Cir. 1978) ..............................................12

*Philadelphia Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986) ..........................................................7, 11

ii

*Riley v. Harr,*
    292 F.3d 282 (1st Cir. 2002) ............................................................................8, 9

*Sandmann v. WP Co.,*
    401 F. Supp. 3d 781 (E.D. Ky. 2019) ............................................................7, 9, 14

*Seaton v. TripAdvisor LLC,*
    728 F.3d 592 (6th Cir. 2013) ..........................................................................7, 11

*Taxpayers' League of Bell County v. Sun Publ'g Co.,*
    75 S.W.2d 564 (Ky. 1934) ..................................................................................15

*Watts v. State of Ind.,*
    338 U.S. 49 (1949) ..............................................................................................9

*Yancey v. Hamilton,*
    786 S.W.2d 854 (Ky. 1989) ..................................................................................7

Plaintiff Nicholas Sandmann's Complaint against CBS concerns admittedly subjective interpretations of admittedly true facts and an alleged defamatory meaning found nowhere in the challenged CBS news report.[1]  For any of these reasons, summary judgment is appropriate.

Sandmann pleads that early commentary about the events on the National Mall on January 18, 2019, omitted essential context and in so doing, portrayed him as engaged in racist misconduct. The CBS Report is not such a report.  Rather, it came *two days later*.  In fact, its entire premise was to provide additional context based on, among other things, the longer 1-hour and 46-minute video that had emerged, excerpts of which CBS played—the same video Sandmann says contains "the truth."  As CBS explained, the original viral video "inflamed people who said, 'How disrespectful of this young man and the students,'" but "[t]he problem is there was another video nearly two hours in length."  It then explained the further context:  that the encounter between Sandmann and Nathan Phillips, a Native American elder, began with the Black Hebrew Israelites "yelling profanities at the high school students," and that, in response, Phillips "insert[ed] himself in the situation."  It also reported that it could not hear "Build that wall" on the videos, and that the students "appeared to be doing a "sports chant."  In short, it reported much of what Sandmann pleads is the truth.

Nevertheless, Sandmann sued CBS for $60 million because it reported Phillips' opinion of the encounter:  that "when the others were moving aside," Sandmann "decided he wasn't going to do that," and appeared to "position" himself in front of Phillips in a way that "sort of stopped" his "exit."  As discovery has confirmed, Phillips' expression of his own subjective perception of a confusing and emotionally charged encounter—especially in the manner in which CBS presented it—is protected opinion as a matter of law.  And, in any case, Sandmann cannot prove the statement is materially false based on his own admissions.

---

[1]  The CBS report ("CBS Report") consists of a video streamed on CBS' website on January 20, 2019, embedded in an article posted on cbsnews.com.  *See* Compl. Ex. G and ¶¶ 2, 211-12, 217, 230.

The First Amendment fully protects the responsible, contextual reporting in the CBS Report. Summary judgment should be granted in CBS' favor, for these reasons and those in the *Sandmann* defendant group's Joint Brief ("Jt. Br.") and Statement of Facts ("Jt. SOF") (Doc. 59-1).

## STATEMENT OF FACTS

### A.     The Early Reports and the Later CBS Report

Shortly after the incident on the National Mall occurred, social media websites and various media organizations reported on the viral video of it, interviewed Phillips about the encounter with Sandmann and drew conclusions about what had occurred. *See* Compl. ¶¶ 22, 67. Each complaint in this series of lawsuits stems from Sandmann's claims that some early reporting was flawed and failed to consider a 1-hour 46-minute video of the incident (the so-called "Banyamyan Video"), which Sandmann alleges accurately depicts the events. *Id.* ¶¶ 79-81, 87.[2] Two days later, on January 20, 2019, CBS published the CBS Report, an online news article (the "Article") with an embedded video segment (the "Segment"). *See* Exs. A-1, A-2, B.[3] As with the early reports, Sandmann alleges that CBS relied only on the viral video and "ignored" the longer Banyamyan video. Compl. ¶¶ 15, 79-83. This allegation is without factual support as neither the Article nor the Segment ignored anything.

***The Video Segment.*** The entire premise of the CBS Report, which has been authenticated and must be considered in its entirety, was to report on context not covered in the earlier reports and to show footage from the longer Banyamyan video. As CBS' correspondent, David Begnaud, first explained: "If you've been anywhere near your social media this weekend, checking in on your phone, you may have seen a video that shows a group of high school students in what appears to be a standoff

---

[2]  Sandmann and CBS stipulated to the authenticity of 20 videos, which are on a USB flash drive conventionally filed with that stipulation. *See* Doc 56. The Banyamyan Video is Video 4.

[3]  A copy of the CBS Article is attached as Ex. A-1 to the Declaration of Helen D'Antona submitted herewith. A conventionally filed USB flash drive containing the CBS Segment is submitted as Ex. A-2 to the Declaration. A transcript of the Segment is attached hereto as Ex. B.

with a Native American man on the National Mall in Washington, D.C." Ex. A-2; Ex. B at 1. He then added, "The problem is the story as originally reported is incomplete. We have more information that provides better context and depth to what actually happened." *Id.* (emphasis added).

The CBS Report then provided that "context and depth." First, and most importantly considering Sandmann's erroneous characterizations of the CBS Report, it reported on the existence of the longer Banyamyan Video, which Sandmann characterizes as "accurately set[ting] forth the truth of the January 18 Incident." Compl. ¶ 87. It also played clips from that video. While that video played, Begnaud explained that the original viral video "inflamed people who said, 'How disrespectful of this young man and the students,'" but "[**t]he problem** is there was another video nearly two hours in length [*i.e.*, the Banyamyan Video], most of which we have seen. **And the context it provides suggests that the story is not as originally reported**." Ex. A-2; Ex. B at 2.

CBS reported other context that Sandmann considers critical. For example, it reported that "a group . . . known as the Black Hebrew Israelites" were protesting on the Mall at the same time and that they "start[ed] yelling profanities at the high school students." *Id.* CBS also reported that Nathan Phillips was the one to approach the students. *Id.* ("At one point, Mr. Phillips walks into the middle of the group. Inserts himself in the situation"; showing video). Finally, it reported that it did not hear the students saying "Build that wall" on the video and that the chants "appeared to be a sports chant." *Id.* Throughout, it played the longer Banyamyan video, the original video, and another video (Video 16) showing an aerial view of the incident. Ex. A-2 at 1:09-1:59, 2:08-3:03 (showing Video 4 at 1:12:17-1:12:34, 1:12:44-1:13:17, 1:12:40-1:13:35); Ex. A-2 at 3:23-3:44, 4:24-5:10, 5:40-6:08 (showing Video 16 at 0:00-0:21, 0:00-0:45, 0:00-0:27); *see also* Ex. B (with screenshots).

Further emphasizing the CBS Report's purpose in providing new context, Begnaud stated: "We wanted to talk to the students, the parents but also Phillips" and were "able to get Mr. Phillips on the phone." Ex. A-2 and Ex. B at 2-3. The Segment then included a telephone interview with Phillips,

who explained that the "students weren't really aggressive toward the indigenous people" and that, after tensions between the students and BHI rose, Phillips' "movement of prayer" led him to insert himself between the two groups. *Id.* at 3. Phillips said Sandmann "just stood in front of me, and when the others were moving aside and letting me go, he decided that he wasn't going to do that." *Id.* at 5. He further stated, "You know, I tried to, when I was coming up the steps, I seen him start putting himself in front of me, so I slided to the right, and he slided to the right. I slided to the left and he slided to the left—so by the time I got up to him, we were right in front of him." *Id.* And, he asserted, "He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit." *Id.* Phillips never indicated he felt personally threatened or that Sandmann was physically aggressive or engaged in racist misconduct. Instead, Phillips said Sandmann "didn't say nothing" and, in fact, "there was a couple moments in there that I thought he was gonna break down." *Id.* at 5, 6. Phillips also said he does not want anything to happen to Sandmann. *Id.* at 6.

Wrapping up, Begnaud stated that "[t]he school is saying that the students could be disciplined, possibly even expelled, **but** the video as we've seen it, shows Mr. Phillips walking into the group inserting himself [in the situation]." *Id.* (emphasis added).[4]

***The Online Article.*** The online Article (in which the Segment is embedded) reiterated the reporting in the Segment. It noted that "Phillips said he inserted himself between the students and a small group of African American protesters." Ex. A-1 at 1. It then reported that "Nick Sandmann, a junior at Covington Catholic High School, said the four protesters began yelling 'hateful things' at him and his classmates." *Id.* It further explained that Sandmann said "the students began chanting school spirit chants, with their chaperones' permission, to counter the slurs being yelled

---

[4] This context came on the heels of the Diocese of Covington's statement the day prior stating it would take appropriate action against the students, up to and including expulsion. It did not withdraw that statement until January 25, 2019, four days after the CBS Report. Compl. ¶¶ 93-95 & Ex. D.

4

at them." *Id.* It then quoted the statement that Sandmann's public relations firm released on his behalf: "The chants are commonly used at sporting events. They are all positive in nature and sound like what you would hear at any high school." *Id.* at 2. CBS then reported Sandmann's statement that "at no point did he hear any students chanting 'build that wall' or anything 'hateful.'" *Id.*

At this point, CBS then turned to Sandmann's and Phillips' views on the "apparent standoff." Ex. A-1 at 1-2. First, it reported Sandmann's viewpoint: "Sandmann said he didn't speak to Phillips, nor did anyone block his path. He admitted he was confused as to why Phillips approached him." *Id.* at 2. It then added, "He said he was 'startled and confused' as to why he had approached him after they were yelled at by the other protesters." *Id.* As it did with Sandmann, CBS then quoted Phillips' interview with Begnaud:

> When the others were moving aside and letting me go, he decided that he wasn't going to do that. When I was coming up the steps, I seen him start putting himself in front of me, so I slided to the right, and he slided to the right. I slided to the left and he slided to the left—so by the time I got up to him, we were right in front of him. He just positioned himself to make sure that he aligned himself with me, so that sort of stopped my exit.

*Id.* Asked whether Sandmann should be punished, Phillips said no; if anyone was to be blamed, Phillips thought the adults with the students were to blame for letting things get out of hand. *Id.* at 2.

## B. The Complaint's Allegations Bear No Resemblance to the Actual CBS Report

Despite this balanced reporting, Sandmann filed a $60 million defamation complaint against CBS on March 2, 2020. According to that Complaint, the CBS Report somehow constituted a "false and defamatory factual narrative" accusing Sandmann "of racist misconduct at the National Mall." Compl. ¶ 1. Sandmann alleges the CBS Report conveyed that: (1) he "confronted and threateningly stopped Phillips," (2) he "positioned himself," "aligned himself," and "put[] himself in front of [Phillips]" in order to "stop[] [Phillips'] exit"; (3) he "was the face of an unruly hate mob of hundreds of white, racist high school students who physically assaulted and harassed Native Americans"; (4) he

5

"committed conduct that could constitute, among other things, a hate crime punishable by 18 U.S.C. § 245 (b)"; and (5) his "behavior constitut[ed] menacing racial intimidation of Phillips." *Id.* ¶¶ 3-7.

Notably, beyond the Complaint's allegations about Phillips' statement that Sandmann "positioned" himself in a way that "sort of stopped" his exit, which seeks to impose liability based on a statement made by Phillips to CBS concerning his perception of the events that day, Sandmann cites no specific statements of the CBS Report to support these fictional allegations—nor could he, as none exist.  Instead, he appears to rely on CBS allegedly "ignor[ing]" the full-length Banyamyan Video as proof for his allegations regarding racist misconduct and blocking because "[t]he truth" was contained in that Video. *Id.* ¶ 16.  But discovery has shown that CBS did not ignore the video; it showed the video to its readers and viewers.  In fact, much of the CBS Report was based on the Banyamyan Video and the additional "context it provides."  Ex. B at 2.

As CBS actually reported what Sandmann alleges it ignored, his attacks on the CBS Report in his Complaint are, simply, demonstrably false.  Sandmann complains that CBS did not verify "incendiary allegations" that students chanted "Build that wall."  Compl. ¶¶ 23-24.  But, in fact, CBS affirmatively reported it did not hear the students chanting "Build that wall" in the videos.  Ex. A-2; Ex. B at 2.  Sandmann complains the students were the targets of vitriol from BHI.  Compl. ¶ 11.  CBS reported that too.  *Id.*  Sandmann complains that, in fact, Phillips approached him and the students.  Compl. ¶ 9.  But, again, CBS reported that also.  Ex. A-2; Ex. B at 2.  Other more conspiratorial allegations in the Complaint as to Phillips' and others' conduct that day are also without basis, as shown both below and in the Joint Brief and Statement of Facts.

## ARGUMENT

Sandmann has the burden of proving falsity, but he cannot do so here for three independent, but related reasons: *first*, Phillips' statements to CBS are protected opinion; *second*, Sandmann admits the material facts on which Phillips' statements are based; and, *third*, even if he could

overcome these hurdles, the entire basis of his Complaint against CBS—namely that the CBS Report accused him of "racist misconduct"—is make-believe.  Summary judgment is in order.

## I.     Phillips' Statements to CBS Are Nonactionable Opinion

Sandmann's implicit thesis for this case is that his perception of the events that day is unassailable but Phillips' is not.  The law, however, protects all opinions equally.

"[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986).  Protection for statements of opinion "stems, in part, from plaintiff's burden of proving falsity, a component of which is proving that a statement is amenable to disproof." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988).  That is, because subjective opinions cannot be objectively proven true or false, they are nonactionable as defamation. *Cromity v. Meiners*, 494 S.W.3d 499, 503 (Ky. Ct. App. 2015); *Sandmann v. WP Co.*, 401 F. Supp. 3d 781, 789 (E.D. Ky. 2019) (only statements "capable of being proved objectively incorrect" meet the falsity requirement).  As this Court has rightly emphasized, "[f]ew principles of law are as well-established as the rule that statements of opinion are not actionable in libel actions"—a rule "based on the right to freedom of speech in the First Amendment." *Id.* at 791.

In assessing whether a statement in a news report is fact or opinion, the publication as a whole must be considered. *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989).  Thus, statements that are, in context, subjective perceptions of events necessarily cannot be provably false. *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 598 (6th Cir. 2013) (approvingly cited in *Sandmann*, 401 F. Supp. 3d at 788); *accord Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (participants in events, and publishers, are "entitled to their interpretation" of facts in the world).  This is especially so where the speaker is offering conjecture or speculating about another person's motive or state of

mind.  *See* cases discussed at Jt. Br. at 32; *see also Haynes*, 8 F.3d at 1227 ("[A]nyone is entitled to speculate on a person's motives from the known facts of his behavior.").

That is precisely the case here: CBS presented additional context in a story about competing perceptions on an event in the world.  As discovery has borne out, Phillips' statements to CBS about how he perceived what happened that day are inherently subjective statements of his perceptions of Sandmann's intentions and of the circumstances that resulted in the confrontation— most of which Sandmann either freely admits or begrudgingly contests without factual support. Just as Sandmann is entitled to his own perceptions of what happened and why, so too is Phillips; and, certainly, CBS is protected in reporting both sides' views to the public.

### A.    Phillips' Statements to CBS Reflected His Perception of the Encounter

Sandmann alleges that it was "false" for Phillips to convey that Sandmann "stood in front of me, and when the others were moving aside and letting me go, he **decided** that he wasn't going to do that," and "just *positioned* himself *to make sure that he* aligned himself with me, so that sort of stopped my exit."  *See* Compl. ¶ 233; Ex. B at 5 (emphasis added).  These are statements of Phillips' subjective interpretation of Sandmann's conduct and motives.  Phillips has confirmed that this was his perception of Sandmann's intentions and that he still believes this today.  Jt. Br. at 32; Jt. SOF ¶¶ 43-44.  Sandmann essentially concedes as much.  In his deposition, he admits he stood in Phillips' way to "stand up for the school" and that Phillips' "could have" perceived from this conduct that Sandmann "intended to stop [Phillips'] path forward."  Jt. Br. at 33; Jt. SOF ¶¶ 39, 46.

In this respect, Sandmann's pleaded case—as opposed to his candid sworn testimony— ignores that "there could easily be a number of varying rational interpretations" about the "disputed events" here.  *Riley v. Harr*, 292 F.3d 282, 290 (1st Cir. 2002); *Haynes*, 8 F.3d at 1227; *see also* Jt. Br. at 32-33; Jt. SOF ¶¶ 39, 43-44, 46.  Indeed, Sandmann's actions that day reflected his own perceptions of the situation, including his intentional decision to "position himself" in Phillips'

8

way to send a message that Phillips could not "intimidate" him.  Jt. SOF ¶¶ 38-41.  Just as Sandmann perceived Phillips' conduct to be intimidating, Phillips offering **his** "personal perspective about some of [the] ambiguities" of Sandmann's conduct cannot be the basis for a claim.  *Riley*, 292 F.3d at 290 (citations omitted).  Were it otherwise, "the threat of defamation lawsuits would discourage expressions of opinion by . . . figures closely involved in a public controversy, or others whose perspectives might be of interest to the public."  *Id.* at 290-91 (citations omitted).

Nevertheless, Sandmann, in his Complaint and in his testimony, repeatedly maintains he correctly and reasonably felt certain ways, but boldly claims that others' perceptions are incorrect.  But free speech is not a one-way street, and Sandmann's "heads-I-win, tails-you-lose" approach to subjective human interaction has no basis in facts disclosed during discovery in this case or in basic common sense.  *Watts v. State of Ind.*, 338 U.S. 49, 52 (1949) ("there comes a point where this Court should not be ignorant as judges of what we know as men.").

**B.    Phillips' Perception Is Supported by Sandmann's Own Admissions, and the Disclosed Facts and Context in the CBS Report Confirms It Is Opinion**

Even though Phillips' perception of Sandmann's actions need not be "correct" to be protected opinion, it is, in fact, supported by the video evidence and Sandmann's own admissions about what he was doing and what the scene was like.  Moreover, the CBS Report's framing— presenting Phillips' views as one perspective on a hotly contested event and allowing readers and viewers to judge based on the disclosed facts—is the essence of pure opinion.

As the Court noted in its initial *Washington Post* ruling, Phillips was "in the center of a confusing confrontation" and while Sandmann "avers [his intent] was to diffuse the situation by remaining motionless and calm. . . . Phillips, however, interpreted Sandmann's action" as blocking his exit—or as he said to CBS, "sort of stopping [his] exit."  *Sandmann*, 401 F. Supp. 3d at 792.

Discovery—and the admitted facts of record—validate the Court's initial conclusion.  For

example, Sandmann admits that as the other students in front of him were moving out of Phillips' way, Sandmann "moved" over to his left, "plant[ed] [his] foot," and was "right in front of Phillips" when Phillips approached.   Jt. SOF ¶¶ 40-41; Video 17 at 3:37-3:42 (looking down to adjust his footing as he moved).   Sandmann also does not dispute that someone watching could have noticed he moved, *id.* ¶ 41, or that Phillips "could have" perceived he "intended to stop his path forward" as Phillips stated in the CBS Report ("sort of stopped my exit")*.*   Jt. SOF ¶ 46; Ex. B at 5; Ex. A-1 at 2.

And, seeing this movement, Phillips actually perceived that Sandmann "position[ed] himself" to be directly in front of him and then stood in his way.  Jt. SOF ¶ 43.   Further, when Phillips first reached the spot where Sandmann planted himself, Phillips turned to his left towards the student next to Sandmann, and that student moved over.   *Id.* ¶ 42.   But when Phillips turned back and looked forward, Sandmann still did not move for him to pass.   *Id.*   Sandmann admits this, and admits it is "possible" Phillips was trying to see if both Sandmann and the student next to him would move out of his way.   *Id.*   Again, Phillips' perception of Sandmann's intent—"I seen him start putting himself in front of me . . . to make sure that he aligned himself with me, so that sort of stopped my exit"—is not only Phillips' subjective perspective, but a rational one based on the facts Sandmann admitted.

Sandmann also admitted at his deposition and in written emails and texts near the time of the event that he deliberately stood his ground in front of Phillips "unlike others" who moved aside.  Jt. SOF ¶ 40.   He also admits he did so intentionally to send a "message" that he would not be "intimidated" or "move[d]."   *Id.* ¶¶ 39-40.   Indeed, other students observing Sandmann's conduct had the same perception (*e.g.*, yelling "you can't move him") as Sandmann concedes can be heard on the videos.   *Id.* ¶ 48.   That Phillips also picked up on Sandmann's admitted body language and intent is hardly surprising.   As Sandmann also concedes, Phillips only locked eyes with him when he realized he was the only student who was not stepping aside to let him pass.   *Id.*

10

¶ 44 ("Q. Did you feel like the two of you were at an impasse? . . . A.  In some form of it, yes."). In that moment, it was Phillips' exceedingly reasonable perception that Sandmann "sort of stopped" him from exiting the situation and intentionally stood in his way.

In view of all this, Phillips' "subjective weighing of factors" in the world that led him to describe what he perceived "cannot be proven false and therefore cannot be the basis of a defamation claim." *Seaton*, 728 F.3d at 600.  Moreover, where, as here, the factual bases for a subjective perspective are disclosed, the "reader is in as good a position" as the speaker to "judge" who should be believed. *Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 882 (E.D. Ky. 2006), *aff'd*, 280 F. App'x 503 (6th Cir. 2008).  And, not only did CBS report the broader context to the reader and viewer, it provided the public **demonstrative video evidence**: the longer Banyamyan Video perspective on which Sandmann himself relies (accompanied by narrative emphasizing Phillips' initiative in approaching the students)—and another video (stipulated Video 16) depicting an aerial view showing the "space" to Sandmann's side that opened up when others moved and Sandmann did not, which Sandmann claims supports his perception that Phillips could have gone around him. Ex. A-2 at 3:23-3:44, 4:24-5:10, 5:40-6:08; Ex. B at 4 (with screenshot); Jt. Br., Ex. B (S.D. 223:14-224:2, 232:11-234:1).  Thus, CBS provided complete balance visually, allowing viewers to decide if Phillips' perception was correct or if, as Sandmann claims, Phillips was not "sort of stopped."

## II.    Sandmann Cannot Meet His Burden of Proving Material Falsity

Even if Phillips' interpretation of Sandmann's conduct in the contested encounter were a "fact" capable of disproof, summary judgment should still be granted to CBS because Sandmann has admitted that the complained-of statements reported by CBS are not materially false.

Plaintiffs in defamation actions like this one have the burden of proving falsity.  *Hepps*, 475 U.S. at 777.  Importantly, the falsity must be material such that the complained of statements would have a different effect on the mind of the reader "from that which the pleaded truth would

have produced." *Air Wisc. Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014). Put differently, summary judgment should be granted where the challenged statements are substantially true, *i.e.*, "it is not essential that the literal truth be established in every detail as long as the article contains the gist of the truth as ordinarily understood." *Orr v. Argus-Press Co.*, 586 F.2d 1108, 1112 (6th Cir. 1978).

Here, Sandmann has admitted the gist of the reported statements is substantially true. He testified that the day after the encounter he texted Charlie Kirk to say that "unlike others at my school i didn't step out of the way because he [Phillips] was trying to intimidate us." Jt. SOF ¶ 40; *see also id.* ¶¶ 38-39. His own words are almost verbatim to what Phillips recounted to CBS: when "others were moving aside" to let Phillips go by, Sandmann "decided he wasn't going to do that," and in doing so, he "sort of stopped" Phillips' progress, at least momentarily or through Sandmann. Exs. A-1, A-2, B. As Sandmann testified, he wanted to send a message to Phillips that he would not be intimidated: "And to me, that was standing up for the school, **because I wasn't going to move**." Jt. SOF ¶ 40 (emphasis added). The description by Phillips that Sandmann "positioned" or "aligned" himself in a way that "sort of stopped" his exit is simply another way of expressing the intentional conduct Sandmann has now admitted. *See Hoeper*, 571 U.S. at 254-55 (no "material difference" between "a statement that [plaintiff] had just 'blown up' in a professional setting" and allegedly defamatory statement that "he was '[u]nstable'"); *see also* Jt. Br. at 45-50.

Because the gist or sting of Phillips' comments is accurate, Sandmann resorts to irrelevant parsing and quarreling with the language Phillips chose to describe the encounter. For example, Sandmann testified that while he might have "slided," as Phillips told CBS, he did not slide **that many inches**. Jt. SOF ¶ 41 ("I moved six inches at the most.").[5] Material falsity, however, cannot

---

[5] Sandmann further concedes Phillips then turned to his own left then right back towards Sandmann, who still refused to move. Jt. SOF ¶ 42. Sandmann also concedes that moments earlier, in contrast to the other students getting out of the way, he "may have" moved to his right as Phillips was making his way through the crowd, which video evidence also shows. Jt. SOF ¶ 41, n. 5.

be measured in inches.  Whether he slid six inches or eighteen is irrelevant because it does not change the **admittedly true** gist or sting in the mind of the reader/viewer—that Sandmann deliberately did not move aside and instead "planted his feet" in front of Phillips to send a message. As such, Sandmann cannot maintain his $60 million claim over what can only be described in the most charitable sense as disagreement over alleged "minor inaccuracies."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991) (truth inquiry "overlooks minor inaccuracies and concentrates upon substantial truth").

At the end of the day, Sandmann's lawsuit asks the Court to give its imprimatur to **his** subjective spin on the encounter, in which he is the hero and Phillips is the villain.  But having admitted that he purposefully stood his ground in front of Phillips, Sandmann cannot control how "other people would conceive of the situation," which was "caused by his own actions" in deciding not to move aside, and very much in the eye of the beholder.  *Estepp v. Johnson County Newspapers, Inc.*, 578 S.W.3d 740, 746  (Ky. Ct. App. 2019) (affirming summary judgment). Under settled principles of material falsity, Sandmann cannot claim defamation by enforcing his "preferred characterization" on others.  *See id.*

## III.    The CBS Report Dispels Sandmann's Invented Defamatory Meaning

This Court should also grant summary judgment to CBS for the independent reason that the CBS Report is simply not defamatory of Sandmann.  It is Sandmann's burden to establish that the CBS Report conveys the claimed defamatory meaning.  *Dermody v. Presbyterian Church (U.S.A.)*, 530 S.W.3d 467, 472-73 (Ky. Ct. App. 2017).  According to Sandmann, the defamatory meaning is not simply that he "sort of stopped" Phillips, but rather that he did so in such a way so as to constitute "racist misconduct."  Sandmann makes this crystal clear in the first paragraph of his Complaint.  Compl. ¶ 1.  But Sandmann cannot meet his burden of establishing this defamatory meaning because the CBS Report conveys no such thing.

13

In determining whether the claimed defamatory meaning exists, the Court "must 'analyze the article in its entirety'" and "stay within [its] four corners." *Sandmann*, 401 F. Supp. 3d at 790. For purposes of the motion to dismiss, this Court accepted Sandmann's allegations—that Sandmann "threateningly stopped" and "physically intimidated" Phillips and that "conveys a defamatory meaning because it imputes to Sandmann racist conduct."[6] Dism. Order, Doc. 34 at 1-2, 5.   Now, on summary judgment, Sandmann cannot rely on mere allegations that the complained-of language conveys physically threatening racist misconduct; instead, he must marshal facts creating a genuine dispute as to the defamatory meaning of the CBS Report. *See, e.g.*, *Friskey v. Bracke*, 2020 WL 465026, *7 (E.D. Ky. Jan. 28, 2020) (Bertelsman, J.) (granting summary judgment).  He cannot do so because nothing in the CBS Report provides the grist for Sandmann's pleaded case of "racist misconduct"—just the opposite.

At a most basic level, neither in Phillips' interview nor anywhere else in the CBS Report does anyone accuse Sandmann (or any student) of racist misconduct—indeed, CBS, draws into doubt the "build that wall" accusation, which is central to Sandmann's claimed imputation.[7] Ex. A-2; Ex. B at 2.  Nor is there any basis in the CBS Report for finding that Phillips was physically or seriously threatened by Sandmann—and certainly not because of his race.  Again, **Phillips never says that and CBS never implies it.**  What Phillips does say is that Sandmann stood silently in front of him,

---

[6]  CBS acknowledges the Court previously stated that "no amount of context removes the meaning of a statement *alleged* to be defamatory per se."  Doc. 34 at 6 (emphasis added).  However, CBS does not understand that observation to apply at this stage, where Sandmann cannot rely on mere allegations. *See, e.g.*, *Greenbelt Co-op. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13 (1970) (rejecting allegation that use of word "blackmail" was defamatory per se when considered against developed facts, namely the nature of the challenged articles and the context of "heated . . . debates about controversial issues").

[7]  *See, e.g.*, Compl. ¶ 169 ("false accusation that Nicholas and his classmates were chanting 'Build the wall!' at Native Americans during and/or following an Indigenous Peoples March provided additional context to the false and defamatory factual narrative published by CBSN, from which a reasonable reader would undoubtedly conclude that they were being accused of racist conduct").

at times looking emotionally distraught (he thought Sandmann was going to "break down").  *Id.* at 5, 6.  And, the CBS Report casts doubt on the intimation in prior reports that the students were even guilty of "disrespectful" conduct—emphasizing, as Sandmann has advocated, that the "problem" was how the incident started, with the BHI hurling insults, and that it was Phillips who initiated the encounter by "insert[ing] himself in the situation."  *Id.* at 2; *see also id.* at 9.[8]

Without the "racist misconduct" label Plaintiff alleges, saying that Sandmann placed himself in front of and "sort of stopped" Phillips is simply not defamatory.  Sandmann was, as he has now admitted in the record, exercising a legal right to stand his ground in response to Phillips inserting himself in the situation to show that he would not be intimidated.  Jt. SOF ¶¶ 39-42.  He firmly believes there was nothing wrong with doing so and that it showed him to be "the bigger person" and "very mature."  *Id*. ¶ 44, n. 6.  Given this, the statements CBS reported are not defamatory as a matter of law.  *See, e.g.*, *Better Built Garages, Inc. v. Kentucky New Era, Inc.*, 2008 WL 4531037, at *2 (Ky. Ct. App. Oct. 10, 2008) (describing someone as "exercising a legal right cannot be said to cause a person to be publicly hated, held in contempt, or ridiculed, or to be shunned or avoided"); *cf. Taxpayers' League of Bell County v. Sun Publ'g Co.*, 75 S.W.2d 564, 566 (Ky. 1934) (noting in the context of a different publication that "it cannot be conceived that the use of the word 'blocked' . . . is at all reprehensible").

## CONCLUSION

For the foregoing reasons, CBS respectfully requests that the Court grant its motion.

Respectfully submitted,

*/s/ Natalie J. Spears*

Natalie J. Spears *(pro hac vice)*

---

[8]  The CBS Report bent over backwards to be fair to the students and Sandmann.  The evidence that came out in discovery showed the students **did** in fact behave in a manner toward Phillips that many would consider was mocking or insensitive towards him and the other Native Americans, *e.g.*, the "tomahawk chop" and ersatz war chant.  Jt. SOF ¶¶ 32-33.  That behavior was not included in the video footage CBS showed in the Segment.  *See* Ex. A-2.

Gregory R. Naron *(pro hac vice)*
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com

Jared A. Cox (KBA #92523)
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Suite 3500 Louisville,
Kentucky 40202
Phone: (502) 589-4200
jared.cox@dentons.com

Jessica Laurin Meek *(pro hac vice)*
DENTONS BINGHAM GREENEBAUM LLP
10 West Market Street, Suite 2700
Indianapolis, Indiana 46204
Phone: (317) 635-8900
jessica.meek@dentons.com

*Counsel for Defendants CBS News Inc.,
ViacomCBS Inc., and CBS Interactive Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 20, 2021, I electronically filed the foregoing CBS DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT via the CM/ECF system, which will send notice of filing to all parties of record.

*/s/ Natalie J. Spears*
Natalie J. Spears
