### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### AT COVINGTON

| | | |
|---|---|---|
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : : : : | CASE NO. 2:20-CV-00023-WOB-CJS |
| Plaintiff, | : : | |
| v. | : : | |
| THE NEW YORK TIMES COMPANY d/b/a THE NEW YORK TIMES, | : : : | |
| Defendant. | : : : | |
| | | |
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : : : : | CASE NO. 2:20-CV-00024-WOB-CJS |
| Plaintiff, | : : | |
| v. | : : | |
| CBS NEWS, INC., et al., | : : | |
| Defendants. | : : | |
| | | |
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : : : : | CASE NO. 2:20-CV-00025-WOB-CJS |
| Plaintiff, | : : | |
| v. | : : | |
| ABC NEWS, INC., et al., | : : | |
| Defendants. | : : | |

| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : | CASE NO. 2:20-CV-00026-WOB-CJS |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GANNETT CO., INC. AND GANNETT SATELLITE INFORMATION NETWORK, LLC, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : | CASE NO. 2:20-CV-00027-WOB-CJS |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ROLLING STONE, LLC, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' JOINT RESPONSE IN OPPOSITION TO
NICHOLAS SANDMANN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

LEGAL STANDARD ..................................................................................................... 3

ARGUMENT .................................................................................................................. 7

      A.     Sandmann's assertion that he did not block Phillips defies his own testimony.......................................................................................................7

      B.     Sandmann cannot seek or survive summary judgment by continuing to rely on baseless conspiracy theories about the alleged intentions of Phillips and his supposed "companions."............................................12

           1.     Sandmann's bald allegation that Phillips and a group of alleged "companions" instigated a confrontation has been proven false...........................................................................................13

                a.     The record shows Phillips was trying to calm the situation and there was no conspiracy. ...........................................13

                b.     The record confirms that Phillips was trying to get to the Memorial when Sandmann decided to stand his ground. ........................................................................................14

                c.     Sandmann's other speculative allegations are demonstrably false. .....................................................................18

           2.     Phillips did not need to try to maneuver past Sandmann to be blocked............................................................................................22

      C.     Sandmann cannot offer an expert linguist to contradict his own testimony about the facts and the video evidence................................23

CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*AEP Energy Servs. Gas Holding Co. v. Bank of Am,, N.A.*, 626 F.3d 699 (2d Cir. 2010) ........... 25

*Air Wisconsin Airlines Corporation v. Hoeper*, 571 U.S. 237 (2014)...................................... 4, 10

*Bell v. Courier-Journal & Louisville Times Co.*, 402 S.W.2d 84 (Ky. 1966) ......................... 5, 10

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081 (10th Cir. 2017) ................ 5

*Bustos v. A&E TV Networks*, 646 F.3d 762 (10th Cir. 2011) ......................................... 4

*Emps. Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98 (6th Cir. 1995)........................ 7

*Estepp v. Johnson Cty. Newspapers, Inc.*, 578 S.W.3d 740 (Ky. App. 2019) .......................... 5, 6

*Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993) ...................................... 5

*Kentucky Kingdom Amusement Company v. Belo Kentucky, Inc.*, 179 S.W.3d 785 (Ky. 2005) 5, 6

*McCall v. Courier-Journal and Louisville Times Company, et al.*, 623 S.W.2d 882 (Ky. 1981) .. 4

*McClain v. Mason County, KY*, 618 Fed. Appx. 262 (6th Cir. 2015).......................................... 25

*Nat'l Coll. of Kentucky, Inc. v. WAVE Holdings, LLC*, 536 S.W.3d 218 (Ky. Ct. App. 2017).. 6, 7

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) ................................... 3, 4

*Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir. 1986)....................................... 25

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 487 F.Supp.2d 861 (E.D. Ky. 2007)....... 7

*Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F.Supp.3d 219 (S.D. N.Y. 2015) ........ 7

*Trover v. Kluger*, No. 4:05-cv-014-H, 2007 WL 528419 (W.D. Ky. Feb. 14, 2007).................... 6

*Wilson v. Scripps-Howard Broadcasting Co.*, 642 F.2d 371 (6th Cir. 1981)............................ 3, 5

## INTRODUCTION

Plaintiff Nicholas Sandmann and Defendants agree on one thing: this case is ripe for summary judgment. But not in favor of Sandmann. Instead, the Court should grant summary judgment to the Defendants for either of two reasons. The record shows that the Court should deny Sandmann's Motion for Partial Summary Judgment[1] ("Motion") and enter judgment for Defendants because the Blocking Statements are *not* materially false, but substantially true. And in any event, if the Court grants summary judgment to the Defendants on the threshold issues of opinion or defamatory meaning, Plaintiff's Motion on the issue of material falsity is rendered moot.

In his Motion, Sandmann argues he has established the Blocking Statements are false based upon his own "unequivocal" testimony. (Motion at 16.) Yet Sandmann's actual testimony demonstrates the opposite: he readily and eagerly acknowledges that Phillips was walking forward and other students were moving out of the way, but he alone decided to "plant [his] foot" and "face up" to Phillips and "wasn't going to move" to send a message to Phillips and stand up for his school. Instead of establishing that the Blocking Statements are materially false, it is difficult to imagine a more unequivocal admission that they are true.

Faced with his own problematic testimony, Sandmann chooses to ignore it. Instead, Sandmann presents this Court with a remarkably self-defeating analogy: he says he did not block Phillips because he stood still throughout their encounter on the "wide-open" steps of the Lincoln Memorial like a "lone tree" in an "open field." However, Sandmann concedes that if the two were standing in a more constricted space, like "a narrow hallway," then even a "fail[ure] to get out of the way" would have blocked Phillips. (Motion at 22-23.) Defendants agree, but that should result

---

[1] Sandmann filed the same motion in each case against all the Defendants who join in this opposition. *See ABC*, Doc. 64; *CBS*, Doc. 58; *N.Y. Times*, Doc. 52; *Rolling Stone*, Doc. 59; *Gannett*, Doc. 65.

in summary judgment for the Defendants because the undisputed facts here present an even stronger example of blocking than does Sandmann's analogy. The testimony and the stipulated videos clearly show the encounter between Phillips and Sandmann took place when they were surrounded by a crowd of dozens—some testified *hundreds*—of students, waving tomahawk chops and shouting various taunts like "you can't move him"—a space within which even Sandmann felt physically "stuck."  And within that narrow space not only did Sandmann merely *fail* to get out the way, he also admits he *intentionally* planted his feet in Phillips' path and chose not to move because he wanted to show he would not be intimidated.

At bottom, the arguments in Sandmann's Motion are all an effort to distract from his own admitted conduct and shift responsibility to Phillips. Sandmann continues to propagate the same speculative narrative that he alleged in his Complaint—the idea that Phillips, together with a group of "companions," conspired to instigate a confrontation with a "white student" wearing MAGA attire and to capture it all on video. (Motion at 17-18.) This theory has now been disproven and Sandmann has failed to offer a single piece evidence that would remotely support it. He also argues that Phillips could have gone to the Lincoln Memorial *before* Phillips approached the students (Motion at 23-24) and that Phillips could have tried harder to evade him (Motion at 22).

Those arguments amount to an untenable proposition: that even though Sandmann admittedly intended to stand in Phillips' path to show he would not be intimidated, Phillips nonetheless was not blocked because Sandmann claims Phillips was not actually trying to move past Sandmann. There is zero admissible evidence to support that. Rather, Phillips' testimony confirms that he did want to proceed forward to the Lincoln Memorial when Sandmann planted his feet in front of him and the videos show the two were surrounded on all sides in a space that even made Sandmann feel blocked.

2

Sandmann chose not to depose Phillips or to seek other evidence to support his case, but he now comes before this Court seeking partial summary judgment on the issue of falsity. In lieu of admissible evidence, Sandmann offers up the opinion of a linguistics professor who expressly set out to *ignore* Sandmann's testimony and offer her own interpretations of what she thinks the videos alone show. As explained in the Defendants' accompanying Motion to Strike, this is a patently inadmissible and improper use of purported expert testimony. In short, the undisputed facts demonstrate that Sandmann's Motion should be denied, and summary judgment is appropriate in favor of the Defendants.

## STATEMENT OF FACTS

The Joint Memorandum of Law these Defendants filed in Support of each Defendant's Motion for Summary Judgment included a Statement of Facts. Defendants refer the Court to that Statement and will address the facts most relevant to why Sandmann is not entitled to summary judgment in the course of the Argument below.[2]

## LEGAL STANDARD

Sandmann's Motion fundamentally misstates defamation law with respect to the element of material falsity. First, the Motion fails to acknowledge that it is Sandmann's burden to prove falsity—a fundamental principle of law required by the First Amendment, regardless of whether a plaintiff is a public or private figure. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-76 (1986); *Wilson v. Scripps-Howard Broad. Co.*, 642 F.2d 371, 375 (6th Cir. 1981) ("The same

---

[2] Excerpts of Sandmann's deposition transcript cited in this Opposition (cited as "S.D.") are attached hereto as Exhibit A. For ease of reference to other exhibits, this brief cites to Defendants' Joint Memorandum in Support of Summary Judgment and its exhibits as filed in Sandmann's case against ABC (E.D. Ky. Case No. 2:20-cv-00025-WOB-CJS, Doc. 65-1 through 65-22), which all defendants have filed in their individual cases. Specifically, the declarations cited here are docs. 65-2 through 65-8 in that case. The parties in all these cases also have stipulated to the authenticity of 20 videos and contained on a thumb drive that, for purposes of the record, has been filed with that Stipulation in each case. For ease of reference, this Opposition cites to the docket numbers in Sandmann's case against ABC, which are Doc. 61 (the Stipulation) and Doc. 62 (the thumb drive) in that case. The rest of this Opposition cites to the Videos on that thumb drive simply by their number (Video 1, Video 2, etc.).

rule requiring the plaintiff to prove falsity is required under the First Amendment in libel cases based on negligence or some other standard of fault of lesser magnitude than malice."); *McCall v. Courier-Journal & Louisville Times Co., et al.*, 623 S.W.2d 882, 894-895 (Ky. 1981) (finding, in a private figure case, "[w]e are convinced that *Gertz* and its phylogeny impose the burden of proof and risk of non-persuasion on the issue of falsity of the defamatory statement on the plaintiff").[3] The Motion also argues that "substantial truth" is a "secondary concept" that does not apply to this case at all.  (Motion at 18-19.) That is incorrect, as a matter of both First Amendment and Kentucky law.

The First Amendment requires defamation plaintiffs to prove not mere falsity, but "*material* falsity." *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) (emphasis added); *Hepps*, 475 U.S. at 776 ("In *Gertz*, as in *New York Times*, the common-law rule [regarding falsity] was superseded by a constitutional rule."); *see also Bustos v. A&E TV Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (Gorsuch, J.) (doctrine of substantial truth is "not just a feature of the common law but a First Amendment imperative").  "In the defamation context, a materially false statement is one that 'would have a different effect on the mind of the reader [or listener] from that which the . . . truth would have produced.'"  *Hoeper*, 571 U.S. at 239 (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)). The requirement of material falsity is part of the First Amendment's requirement of proving fault, which by any standard first requires proof of falsity. *Hepps*, 475 U.S. at 776 (1986) ("We believe that the common law's rule on falsity—that the defendant must bear the burden of proving truth—must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering

---

[3]Should the case proceed, Defendants reserve the right to establish later Sandmann's proper status for purposes of which fault standard would apply to his claim, but that status is not relevant to any of the issues raised by Defendants' pending summary judgment motions or Plaintiff's partial cross-motion.

damages."); *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1109–10 (10th Cir. 2017) ("[T]he First Amendment, as applied in *New York Times, Gertz, Hepps,* and *Masson*, requires the plaintiff to prove material falsity . . ."); *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993) ("The rule making substantial truth a complete defense and the constitutional limitations on defamation suits coincide."); *see also Wilson*, 642 F.2d at 375 (the same burden of proving falsity applies to both public and private figure plaintiffs because "the two elements of carelessness and falsity are inevitably linked").

And while First Amendment standards necessarily govern this element of Sandmann's defamation claim, not Kentucky law, Kentucky has consistently applied the well-established common law doctrine of substantial truth. Media defendants can only be held liable for *materially* false statements, and not for statements that are substantially true. *See Estepp v. Johnson Cty. Newspapers, Inc.*, 578 S.W.3d 740, 744 (Ky. Ct. App. 2019) (finding defamation law looks to whether "the substance, the gist, the sting, of the libelous charge be justified") (quoting *Masson*, 501 U.S. at 517 (citation omitted)). Thus, defendants are "not to be held to the exact facts or to the most minute details of the transactions that [they] report[]." *Bell v. Courier-Journal & Louisville Times Co.*, 402 S.W.2d 84, 87 (Ky. 1966).

Arguing that the doctrines of material falsity or substantial truth do not apply to this case, Sandmann relies heavily upon dicta in a single case, *Kentucky Kingdom Amusement Company v. Belo Kentucky, Inc.*, which states that the concept only applies to circumstances involving "incidental information" and not "essential content." 179 S.W.3d 785, 791-92 (Ky. 2005). *Kentucky Kingdom* involved a different and much narrower question—whether a jury's finding of falsity, following jury instructions that did not explicitly discuss substantial truth, was "clearly erroneous." *Id.* at 788-89, 791-92. In finding that it was not clearly erroneous, with respect to the

instructions, the court noted that Kentucky follows a "barebones" approach to jury instructions and that the defendants had been free to clarify the meaning of the falsity instruction in closing argument. *Id.* at 792. The court further found no clear error because its own review of the facts confirmed the statements were "fundamentally inaccurate." *Id.* The court explained it would not supplant the "sanctity of the jury verdict" where it found that evidence supported the verdict. *Id.* at 790.

But *Kentucky Kingdom* specifically distinguished a court's role in reviewing a jury verdict from the scenario that was presented in *Bell*, which the court explained was "a holding on summary judgment that the testimony of the plaintiff showed the truth of each item published. The court in [*Bell*] characterized the truth as 'at least substantially true.'" *Id.* at 791. Consistent with that approach and after the *Kentucky Kingdom* decision was issued, both federal and Kentucky courts have repeatedly granted summary judgment to defamation defendants on the grounds that the gist of the challenged statement was not materially false, even when the statements (unlike here) did contain actual, factual inaccuracies. *See, e.g.*, *Estepp*, 578 S.W.3d at 742, 744-746 (statements that plaintiff was removed from his position were substantially true, even though he actually resigned); *Nat'l Coll. of Ky., Inc. v. WAVE Holdings, LLC*, 536 S.W.3d 218 (Ky. Ct. App. 2017) (affirming summary judgment because statements were true or substantially true); *Trover v. Kluger*, No. 4:05-cv-014-H, 2007 WL 528419, at *7 (W.D. Ky. Feb. 14, 2007) (record shows that plaintiff "would be unable to meet his burden" to prove that certain statements were false).

Finally, Sandmann asserts, "[t]his is not a case where the 'substantial truth' argument is relevant" because "Phillips did not speak in metaphor" or use "figurative, non-literal" language. (Motion at 19.) Here, the Motion flatly misstates the law. The requirement that a plaintiff must prove material falsity is not limited to cases involving "metaphor" or "non-literal" language, and

the two cases Sandmann cites for this principle, *National College of Kentucky*, 536 S.W.3d 218 and *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 235–36 (S.D.N.Y. 2015), do not say that.  In short, Sandmann bears the burden of proving that the gist or sting of Phillips' words are false.

## ARGUMENT

Sandmann cannot meet his burden of proving material falsity.  His own testimony establishes the Blocking Statements were substantially true. It is well-established that to either seek or withstand a motion for summary judgment, the plaintiff "would have to move beyond the bare allegations of its pleadings and begin to develop facts of some substance sufficient to withstand, or support, summary judgment." *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 103 (6th Cir. 1995); *see also Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 487 F.Supp.2d 861, 884 (E.D. Ky. 2007) ("This Court, in determining whether an issue may properly be considered at the summary judgment stage, must rely on actual evidence.  Arguments requiring a court's speculation, and going well beyond the submitted evidence, are insufficient means for granting summary judgment.").  The Motion fails to satisfy that burden with respect to either supporting or avoiding summary judgment.

Instead of confronting this testimony, Sandmann speculates that Phillips was not really trying to move past him, so he could not have been blocked.  But the time for engaging in such speculation has passed, and discovery has proven Sandmann's speculation and conspiracy theories to be false.

### A.    Sandmann's assertion that he did not block Phillips defies his own testimony.

Without any citation to the record, Sandmann asserts that his testimony establishes "unequivocally that he never had it in mind to block nor did in fact block Phillips."  (Motion at

16.) But that does not square with his actual testimony, which includes both Sandmann's personal knowledge as a percipient witness *and* his sworn testimony about what videos from that day depict.

At his deposition, Sandmann acknowledged that when Phillips began to walk forward (after Phillips had stood between the students and BHI for about two minutes), there were multiple rows of students standing between Phillips and Sandmann, as can be seen on several videos (Phillips and Sandmann are identified by the yellow circles):





(Video 10 at 00:12; Video 17 at 02:29; *see* S.D. 160:17-161:6 ("Q: …And so at that point, there are several rows of students between you and where Mr. Phillips is, right?  A: Correct.").)

Sandmann also acknowledged that when Phillips started walking forward, Phillips was moving in the direction of the Lincoln Memorial, that the students in front of Sandmann moved out of Phillips' way, and that Sandmann noticed that at the time.  (Video 10 at 0:12-26; S.D. 161:7-

24 ("Q: And in this video [Video 10 at 0:12-0:26], the direction he's moving in is towards the Lincoln Memorial, right? A: Right."); *see* Video 2 at 00:32-00:44; S.D. 215:5-215:21 ("Q. So in those 12 seconds, those several rows of students who were in front of you before have parted for Mr. Phillips, right? A: Right."); S.D. 158:8-159:1 ("Q: …So you knew that some of the other students were parting? A: That's correct. Q: They were moving out of Phillips' way? A: Yes. Q: To allow a path for him? Okay. And you saw that Phillips was starting to walk through your group? A: Yes. Q: All right. He was going forward, right? A: Right.").)

　　But Sandmann testified that he decided not to follow his fellow students and move out of Phillips' way because he thought Phillips was trying to intimidate the students.  (S.D. 180:10-181:4 ("Q:  So again, you were -- you were aware that others -- other students were stepping out of Phillips' way? A. Right. Q:  But you didn't because you thought he was trying to intimidate you collectively? A. Yes, me and other students at the school.").)  Sandmann's testimony confirmed what he texted two prominent young conservatives in the very first messages he sent to anyone about the incident: "The man played a drum in my face but *unlike others at my school I didn't step out of the way* because he was trying to intimidate us." (S.D. 176:21-181:4 and Exs. 11-12 (emphasis added).)  As Sandmann explained at his deposition:

> I figured was it time for someone to plant their foot and stand there where I had been and just face up. And to me, that was standing up for the school, because I wasn't going to move. . . . I just felt like enough is enough, we don't need to respond to them anymore with chants: Someone's just got to stand here, be still and put their foot down.

(S.D. at 174:25-176:20; *see also* S.D. 167:16-169:11 & Ex. 10 at 2-3 (in a text exchange the next day, a friend asked Sandmann what "made [him] stand in front of the [I]ndian guy" and Sandmann replied: "[T]he whole thing with the black people calling us things and the guy moving through the crowd trying to intimidate us.  [I]t just made me want to stand up for the school.").)  Sandmann

9

also specifically admitted that if Phillips had continued to try to move directly forward, he would have knocked into Sandmann. (S.D. 276:17-20 ("Q:  I mean, if he just continued to move forward, he would have physically knocked into you?  A: He would hit me, yes.").)  Sandmann also felt he had reached "some form" of "impasse" with Phillips.  (S.D. 263:7-10.)

Sandmann's Motion does not even acknowledge, let alone attempt to address these statements, which contradict the bare allegations in his own pleadings. Instead, his brief offers revisionist rhetoric, claiming that he just "smiled awkwardly" and "did his best to handle a very uncomfortable situation with dignity," but the testimony he cites does not say that. (Motion at 23, citing S.D. 199.)  To the contrary, in that cited testimony, Sandmann actually admits that Phillips could have perceived that Sandmann intended to stop his path forward.  (S.D. 199:3-16 ("[]would you acknowledge that he could have perceived that it was your intention to stop his path forward? A. Right.").)[4]

If Phillips had said that Sandmann planted his foot, faced up, put his foot down and wasn't going to move (just as Sandmann testified), the effect on the reader would not be materially different than Phillips' description that "[h]e just blocked my way and wouldn't allow me to retreat." *See Hoeper*, 571 U.S. at 239.  This case thus resembles *Bell,* in which the Kentucky Supreme Court affirmed summary judgment in part because the plaintiff's own deposition testimony established that several of the statements at issue were "at least substantially true."  *Bell*, 402 S.W.2d at 87.

As if that were not enough, Sandmann's Motion acknowledges that, in a space like a narrow hallway, "a person's failure to get out of the way might be called a 'block.'"  (Motion at 22.)  That is exactly the kind of space in which Phillips and Sandmann were indisputably positioned when Phillips weaved through the crowd and the standoff began.  After Phillips initially approached and

---

[4] Indeed, Defendants' motions for summary judgment cited that very testimony to explain why Sandmann's testimony also conclusively establishes that, at a minimum, the Blocking Statements are protected opinion.

stood in front of the crowd of CovCath students, the students and other onlookers filled in the areas around Phillips, along with the handful of Indigenous Peoples March participants who had joined him to sing the AIM song.  (Phillips Decl. ¶ 21; Bell Decl. ¶ 14; Video 10 at 00:00-00:05.) Sandmann acknowledges that eventually there were "a bunch of people that are behind" Phillips. (S.D. 162:15-167:15.)  As shown in Video 10, taken about 25 seconds before Phillips and Sandmann first came face-to-face, Phillips was not traveling through anything that resembled an "open field":



(Video 10 at 0:02 (with Phillips in yellow circle).)  Sandmann even admits that, to move forward, Phillips had to "wade[ ] through the crowd of students."  (Motion at 23.)  And as Phillips began inching forward, he was only able to move through a narrow space that was created by students in front of him who moved to the side and out of his way.  (Phillips Decl. ¶ 22; Video 10 at 0:12-26; *see also* Joint Mem. at 23 (displaying screenshots from Video 8 at 00:14, 00:16; 00:19; 00:21) showing the tight space around Phillips at the point when he reached where Sandmann stood).)

In short, there is no genuine dispute that Phillips was moving forward in a space that was much like a "narrow hallway" when Sandmann decided to stand his ground.  So, if it is true that a person "blocks" others when they *fail* to get out the way in a narrow hallway, then certainly

Sandmann was blocking Phillips when he *intentionally* "face[d] up" to him and stood his ground in a tight space in the middle of a large crowd of people, which included classmates shouting taunts like "you can't move him!" (Video 17 at 4:38-4:43; Video 2 at 3:20-3:32; S.D. 319:11-319:25), "he ain't moving!" (Video 2 at 1:18-1:22; S.D. 311:6-312:5), and "unmovable object!" (Video 2 at 1:22-1:29; S.D. 312:6-312:21).

In fact, Sandmann testified that the space where the two were standing became so constricted that *he "felt . . .blocked by the crowd."* (S.D. 284:7-10; *see also id.* at 184:11-185:12; 258:23-259:10; 260:11-22.) And even if he had "wanted to," Sandmann claimed he "couldn't have moved to the side for Nathan Phillips at that point . . . ." (S.D. at 286:14-16.) Sandmann further testified there were "students all around [him]" and he was "stuck in the middle." S.D. at 286:9-16. Yet Sandmann felt blocked in that space even though none of the other students near him even arguably "failed to get out of his way," let alone planted their feet to "face up" and "stand their ground" when Phillips approached them. Given that Sandmann intentionally did all of those things, there can be no genuine dispute that he blocked Phillips.

**B.    Sandmann cannot seek or survive summary judgment by continuing to rely on baseless conspiracy theories about the alleged intentions of Phillips and his supposed "companions."**

The rest of Sandmann's arguments are an effort to distract from the consequences of his own admitted conduct. His arguments amount to the proposition that no matter what Sandmann may have intended, he did not actually block Phillips because Phillips was allegedly not really trying to move beyond Sandmann to get to the Lincoln Memorial. He also leans on refuted conspiracy theories regarding Phillips' "companions" to save his claims. But Sandmann offers no admissible evidence to support his arguments. To the contrary, the Motion merely recycles speculative allegations from his Amended Complaints that now have proven to be false.

     **1.** **Sandmann's bald allegation that Phillips and a group of alleged "companions" instigated a confrontation has been proven false.**

Starting with its very first sentence, Sandmann's Motion recites more than half a dozen times that Phillips (supposedly) intentionally instigated a confrontation with Sandmann.  (Motion at 1, 9, 15, 23-24.)  But rather than offer any evidence of that, Sandmann just repeats the same bald allegations from his Amended Complaints, which assert (without evidence) that a small group of Native Americans schemed to ambush unsuspecting white youth.  (Motion at 17-18 ("[I]t was Phillips' intention not to go around Sandmann, but instead to seek out a white student wearing 'MAGA' attire to, as his companion described it, "win" the "demonstration.").)  The words "companion" and "accomplice" are even repeated 21 times in Sandmann's 24-page motion.  But even though the Court offered Sandmann every opportunity to try to prove that speculative theory, *see Washington Post*, Doc. 64 at 2 ("'justice requires' that discovery be had regarding these statements and their context"), Sandmann offers no evidence that Phillips targeted Sandmann, white Trump supporters, or anyone at all.  And the unrebutted record evidence proves the opposite: Phillips "did *not* target Mr. Sandmann or seek him out," nor did he "seek out any other student." (Phillips Decl. ¶ 23 (emphasis added).)  Instead, Phillips initially approached the students in an attempt to calm the situation with the BHI, and only decided to go towards to Lincoln Memorial as a way to exit the crowd of students once he became surrounded.  (*Id.* at ¶¶ 15-17, 22.)

     *a.* *The record shows Phillips was trying to calm the situation and there was no conspiracy.*

Phillips' testimony establishes that he approached the Covington students because he was trying to calm tensions between them and the BHI. (Phillips Decl. ¶ 2.)  After the Indigenous Peoples March, Phillips observed the students shouting at the BHI and became concerned that "a mob mentality had taken over the teenagers" and that the situation could turn violent. (Phillips Decl. ¶¶ 5-7, 9-11.)  So, Phillips borrowed a drum and began singing the American Indian

Movement song as he walked toward the students. (Phillips Decl. ¶¶ 15-17.)  He hoped that singing in front of them would replace feelings of hatred with unity.  (Phillips Decl. ¶ 17.)

A few others who had attended the Indigenous Peoples March followed Phillips.  They were all just people who happened to be in the vicinity, who were observing and were disturbed by the growing confrontation with BHI.  Most shared a religious belief that song and prayer can bring calm to tense situations, and also wanted to support an elder. (Frejo Decl. ¶¶ 13, 25; Bell Decl. ¶ 11; Andrade Decl. ¶ 8.) One was there as a photojournalist. (Stegenga Decl. ¶¶ 2, 9.)

Phillips did not know any of them except a woman named Ashley Bell, nor did the others know each other. (Phillips Decl. ¶¶ 17, 33; Frejo Decl. ¶¶ 14, 25; Bell Decl. ¶¶ 4, 22; Andrade Decl. ¶¶ 8, 19; Stegenga Decl. ¶¶ 8, 16.) Phillips did not ask anyone to videotape anything. (Phillips Decl. ¶ 17; Frejo Decl. ¶ 14; Bell Decl. ¶ 13; Andrade Decl. ¶ 10; Stegenga Decl. ¶ 16.) His decision to approach the students was impromptu and was never discussed with anyone else at all. (Phillips Decl. ¶¶ 16, 33; *see also* Frejo Decl. ¶ 25; Tee Decl. ¶ 15; Andrade Decl. ¶ 19; Stegenga Decl. ¶ 16; Bell Decl. ¶ 22 (no one discussed or intended to create a viral moment).) Sandmann has not (and cannot) offer any evidence to the contrary. Thus, the only evidence in the record refutes the allegations that Phillips conspired with any "companions" to do anything, let alone to instigate a confrontation with Sandmann.

> ### b.    The record confirms that Phillips was trying to get to the Memorial when Sandmann decided to stand his ground.

Sandmann's Motion also repeatedly maintains that Phillips could have just walked up anywhere on the "wide open," 190-feet wide steps to the Lincoln Memorial *before* he approached the students.  (Motion at 7, 15, 22-24.)  He therefore argues that "Phillips was no more blocked than a lone-standing tree can be said to block progress through an open field." (Motion at 23.) Sandmann's fallacious argument is predicated on the assumption that Phillips was trying (or

claimed to be trying) to get to the Lincoln Memorial before he ever approached the students, as if Phillips was a tourist on a stroll from the Reflecting Pool to the Memorial.  But Sandmann does not and cannot cite any evidence in the record to support that. To the contrary, Phillips' unrebutted testimony confirms what he said in the Blocking Statements: that he decided to go to the Lincoln Memorial to exit the situation he found himself in once students surrounded him.

Phillips testifies that he left where he had initially been standing and praying to approach the students and stand between them and the BHI, to try to calm the situation. (Phillips Decl. ¶¶ 11-14, 16-17.) And neither Phillips nor any of the other persons who followed him had the initial intention of going to the Lincoln Memorial when they first started walked toward the students. (Frejo Decl. ¶¶ 13-15; Bell Decl. ¶¶ 11, 13; Andrade Decl. ¶¶ 8-11; Stegenga Decl. ¶¶ 8-9.)

The videos, too, confirm Phillips' sworn testimony about his movements.  To approach the students, Phillips first walked from where he was standing to where the students were—walking parallel to the Memorial (i.e., walking from north to south) in what Sandmann's Motion calls a "northeast to south trajectory" (Motion at 7.)   (Video 5 at 3:52-4:10; Video 4 at 1:12:18-1:12:32.) Sandmann's repeated assertions that Phillips thus "bypassed and ignored clear pathways on his right leading to the top of the Lincoln Memorial" (Motion at 7) is a rhetorical *non sequitur* because Phillips was not going to the Memorial at that point.  He could be equally said to have "bypassed and ignored clear pathways" to the Reflecting Pool and the Washington Monument (to his left/east), the Vietnam Veterans' Memorial (to his rear/north), and/or the Potomac River (straight ahead/south), but he was not going to any of those places either.

Once Phillips reached the students, he turned to face the crowd and stood in roughly the same place for almost two minutes while he continued drumming and praying. (Video 5 at 4:10-5:23; Video 4 at 1:12:33-1:14:15.) But during that time, many students began dancing, hooting,

laughing, and doing tomahawk chop chants.  (*E.g.*, Video 2 at 00:24-00:33; Video 4 at 1:14:07-1:14:15; Video 5 at 4:23-5:10; Video 17 at 2:00-2:45; S.D. 152:13-153:14, 209:11-23.)  Phillips only "decided in that moment to try and exit by going up towards the Lincoln Memorial and to finish [his] prayer there" after he "felt that the crowd was swarming and surrounding [him]" and was "scared" for the people who had accompanied him.  (Phillips Decl. at ¶¶ 21-22; *see also* Video 2 at 00:10-00:23; Video 10 at 00:00-00:11.)  As Sandmann himself acknowledges, Phillips was in fact *moving in the direction of the Memorial*, and the students in front of Sandmann had moved out of Phillips' way, when the two of them first came face-to-face.  (Video 10 at 0:12-26; S.D. 161:7-24 ("Q: And in this video [Video 10 at 0:12-0:26], the direction he's moving in is towards the Lincoln Memorial, right? A: Right.").)  There is simply no evidence that Phillips intended to go to the Lincoln Memorial *before* he decided to try to exit the situation he found himself in within the crowd of students.

Moreover, Phillips testified that he continued to walk towards the Memorial until Sandmann stood in his path.  He was moving forward towards the Memorial as teenagers in front of him moved out of his way when it appeared to him that unlike all others, one teenager (who was Sandmann) did not move and appeared to position himself in front of him to stand in his way.  (Phillips Decl. ¶¶ 23-24.)  Even so, Phillips' initial reaction was to turn away from Sandmann, but though one student to Sandmann's right started moving, Sandmann still did not to give Phillips room to proceed there.  Perceiving that Sandmann wanted to block him, at that point Phillips too remained standing in place. (*Id.* ¶¶ 24-26).

The video evidence shows, and Sandmann's sworn testimony confirms, that what Phillips describes in his Declaration is exactly what Phillips did.  As Phillips began inching forward in the direction of the Lincoln Memorial, student after student moved to the side and out of Phillips' way.

(Video 10 at 0:12-26; S.D. 158:8-159:1; 161:7-24; *see also* Video 2 at 00:32-00:44; S.D. 215:5-21.)  As the other students in front of Sandmann were moving out of Phillips' way, Sandmann moved to his own left, as he admits, and was standing "right in front of Nathan Phillips" when Phillips first reached Sandmann. (S.D. 247:15-248:8; Video 17 at 03:37-03:42.)

Sandmann and Phillips initially came face to face at the point (screenshots 1 and 2 below), and then Phillips turned to his own left.  Another student standing there moved (screenshot 3), but when Phillips turned and looked forward again Sandmann still did not move (screenshot 4).  (Video 8 at 00:15-00:21; S.D. 229:16-232:6; 236:24-237:10 (Q: So we have established that initially you and Phillips came face to face? A: Right. Q: And Phillips turns to his left? A: Right. Q: He is looking at Cammeron [the student next to Sandmann]? A: Right. Q: Right? And Cammeron moves-- A: Right. Q: -- to the right? And then Phillips turns back towards you, right? A: Right.")):



1



2



3



4

(Video 8 at 00:14, 00:16; 00:19; 00:21.)  Sandmann even admits that it is "possible" Phillips was trying to see if both Sandmann and the student next to him would move out of Phillips' way.  (S.D. 237:25-238:19.)  He also admits that Phillips "locked eye contact" with him *because* Sandmann was the *only* student who was not moving.  (S.D. 262:21-263:4; 269:9-12 ("So he locked eye contact with you because you were the only student who wasn't moving, right? A. Yes.").)  In short, there is no evidence Phillips was trying to instigate a confrontation with anyone when Sandmann deliberately decided to stand his ground.  To the contrary, Sandmann admits it was he who was intending to send a pointed message to Phillips.

### c.   Sandmann's other speculative allegations are demonstrably false.

Not only is there no evidence to support Sandmann's baseless conspiracy theories about instigating a confrontation, but his Motion is also replete with speculative assertions that are directly refuted by the record.  For example, Sandmann's Motion repeated states that "Phillips' companions were holding cameras pointed towards the students."  (Motion at 6.)  But the only "evidence" it cites are three seconds of video which merely show two different persons holding cameras:



(Motion at 6, 8, citing Video 2 at 03:00, 03:39; Video 15 at 00:32.)

The first two videos show Jon Stegenga, who was a freelance photojournalist and had no connection to Phillips.  (Stegenga Decl. ¶ 16.)  The third video simply shows an onlooker with a smartphone, one of many who can be seen in videos from that day. Sandmann offers not a scintilla

of evidence connecting whoever that person may be to Phillips, let alone to some conspiracy to ambush white students and capture a viral moment.

The only time Sandmann ever points to anything Phillips actually *said himself* is when he asserts that "Phillips raised his arms and called something to the crowd, ostensibly in support of what his companions were saying." (Motion at 9-10, citing Video 3 at 03:55.) But what the cited video shows was Phillips calling out "Relatives, Relatives." (Video 6 at 00:00-00:23.) Phillips was trying to address everyone in the area, especially the students—in his culture, "relatives" is simply a way to get the attention of a large group of people, not an expression of "support" for conspiring "companions." (Phillips Decl. ¶ 31.)

Just how much Sandmann's Motion relies on baseless speculation is especially apparent from his repeated reference to the isolated words spoken by a single person who was standing near Phillips. To advance his conspiracy theory, Sandmann's relies on at least four levels of speculative foundation: he assumes that (1) that individual and Phillips knew each other; (2) the two conspired before Phillips approached the students to ambush someone to capture a viral moment; (3) that individual's isolated words mean what Sandmann assumes they mean; and (4) his words can be imputed to Phillips to reflect Phillips' own thoughts and intentions. But the evidence shows that not one of his unsupported assumptions is accurate.

The Motion repeatedly speculates about statements made by this purported "companion" of Phillips whom he describes as wearing a red hat. Had Sandmann bothered to seek any discovery regarding this person, he would have learned his name is Alvaro Andrade. He would have also learned that that Phillips did not know Andrade, never asked Andrade (or anyone) to record anything, never discussed approaching the students with him, and indeed the only words the two exchanged before the encounter was Andrade's suggestion that Phillips sing to try to bring some

calm to the situation.  (Phillips Decl. ¶¶ 12, 17, 33; Andrade Decl. ¶¶ 8, 10, 19.)  Sandmann assumes that because Andrade called Phillips "grandpa," the two knew each other, (*see* S.D. 272:14-17), but "grandpa" is simply a culturally common way to address any elder person. Andrade Decl. ¶ 17.  As to Andrade's other words, Sandmann speculates that Andrade was referring to Sandmann when he proclaimed, "I got him, man." (Motion at 9.)  However, the record establishes that those words were spoken as part of a conversation between Andrade, Marcus Frejo, and then Ashley Bell (some of which can be heard on the videos) about not leaving Phillips alone after the students had left.  The "him" referred to Phillips, not Sandmann, and Andrade was telling Frejo (as did Bell) that he would stay with Phillips to protect him.  (Andrade Decl. ¶ 16; Frejo Decl. ¶ 22; Bell Decl. ¶ 18; Video 3 at 02:43-02:55; Video 11 at 01:23-01:33.)

The Motion also points to Andrade telling "another companion, as he grabbed Phillips' right arm, "he won, man; he fucking won, man!", apparently referring to Phillips.  (Motion at 9.)  But Andrade was referring to Phillips to express Andrade's personal view that Phillips, and a few who followed behind him, had successfully calmed the tension between the BHI and the students. (Andrade Decl. ¶ 17.)

Sandmann further speculates that when Andrade complained to a chaperone that "[w]e had a demonstration here, and then you come here, and you do this," by "demonstration" Andrade was referring to the encounter between Phillips and Sandmann.  (Motion at 9, 17-18, 23; Video 11 at 1:08-1:23.)  Sandmann's supposition is based on nothing more than speculating from Andrade's isolated words that there was some pre-planned political "demonstration" cooked up by Phillips' "companions."   But the evidence shows there was no such conspiracy, nor were Phillips and Andrade even acquainted, let alone "companions." Andrade was referring to the Indigenous

Peoples March and was expressing his frustration to a chaperone that after the "peaceful and positive" march, he felt "the students caused a disruption."  (Andrade Decl. ¶ 15.)

Finally, Sandmann cannot use Andrade's words to prove *Phillips*' intent.  To the extent Phillips could hear some of what Andrade said, Phillips often respectfully disagreed with him, and Frejo at one point even urged Andrade to stop engaging with another student. (Phillips Decl. ¶ 27; Frejo Decl. ¶ 20.)  Likewise, Sandmann testified that he often disagreed with what some other students said or did, including several who actually were his best friends when they lobbed taunts like "grab his d—k and twist it" and "beat that drum." (S.D. 300:22-17; 309:10-13; 315:6-18.)

Sandmann *knows* that the unsupported conspiracy theories in his Complaint are not sufficient to oppose Defendants' motions for summary judgment.  When his former counsel urged the Court to reconsider its initial dismissal order and allow the cases to proceed to discovery (and subsequently filed more cases), they emphasized this very point.  *See, e.g.*, *Sandmann v. WP Company, LLC*, No. 2:19-cv-19, Doc. 60 at Page ID #828 (E.D. Ky. 2019) ("Your Honor is trying to look at these various videos to figure out what was Phillips saying. The problem is, the only way to answer that question is to depose Mr. Phillips."); *id.* at Page ID #834-5 ("We do not want it to be decided on what Mr. Baine thinks that Nathan Phillips was trying to say or what Joe Blow said in a comment. We want to go to the principals; Nathan Phillips, the eyewitnesses, the reporters.").[5]  Once discovery was underway Sandmann was free to make whatever strategic choices he wished, but at this stage he cannot continue to rely on self-serving speculation to either support or oppose motions for summary judgment.

---

[5]It is therefore especially disingenuous that, to try to support his claims here, Sandmann cites argument from counsel to a former defendant in these cases, *The Washington Post*, during the Court's hearing on the *Post*'s motion to dismiss Sandmann's original complaint.  (Motion at 13.)  Mr. Baine was arguing in a context in which he had to assume as true all of the Complaint's allegations about the actions and intentions of Phillips, Sandmann and others.  Argument of counsel is not evidence, particularly the arguments of an attorney who did not represent any of the Defendants. Further, Mr. Baine's arguments were made prior to the development of the record before this Court, which clearly refutes Sandmann's allegations.

**2.      Phillips did not need to try to maneuver past Sandmann to be blocked.**

The Motion repeatedly argues the Blocking Statements are false because "Phillips had space but never tried to move around or away from Sandmann. . . ." (Motion at 21-22.)  That argument fails the test of both substantial and even literal truth.

Sandmann's testimony acknowledges that in contrast to his classmates who were moving out of Phillips' way, Sandmann alone decided to plant his feet and was not going to move.  "And when they first came face to face Phillips initially turned to the left but Sandmann still did not move, and Sandmann agrees that Phillips could have been assessing whether Sandmann would move out of the way. (Phillips Decl. ¶ 23; Video 8 at 00:15-00:21; 23; S.D. 229:16-232:6; 236:24-238:19.)  When Sandmann did not move aside like the other students, Phillips concluded that Sandmann did not want to let him pass, a perception which Sandmann acknowledges that Phillips could have had under the circumstances. (Phillips Decl.  ¶¶ 24-26; S.D. 198:24-199:16.) Indeed, Sandmann confirms that he "wasn't going to move" because he wanted to send a message that he would not be intimidated and was "standing up for the school." (S.D. 175:3-14.) Having admitted that he intended to send Phillips a message when he stood his ground, Sandmann has no basis to dispute Phillips' testimony that the message he received was a hostile one.  So, Phillips stayed drumming and praying in place, until eventually Sandmann left after a chaperone told students to leave. (Phillips Decl.  ¶¶ 26, 28.)

By no standard, including the dictionary definition, does the meaning of "blocking" include a repeat-offender requirement by which a person may only be "blocked" if they first search for and try evasive maneuvers to test whether the person who intentionally obstructed their path will block them again.   Sandmann's argument that Phillips had to look for some way to try to "go around" Sandmann, or turn around and try to *walk away* through a crowd that had surrounded him, only confirms that Sandmann was intentionally hindering his progress.

In short, the gist and sting of the Blocking Statements is that Sandmann deliberately impeded his path. *See also Taxpayers' League of Bell Cty. v. Sun Publ'g Co.*, 75 S.W.2d 564, 566 (Ky. 1934) (statement that the plaintiff had "blocked" a county from paying its debts was not materially different than words like "thwarted," "impeded," "hindered," or "delayed"). The record shows that is what happened, even applying a standard of literal falsity. The dictionary definition of "blocking"—which no one (not even Sandmann's proffered expert) disputes—is "to hinder the passage, progress, or accomplishment of by or as if by interposing an obstruction." (Roberts Dep. Ex. A at 16.) By intentionally standing his ground and refusing to move within a crowd in which all other students in front of Sandmann had moved, Sandmann hindered Phillips' passage. Sandmann's Motion should therefore be denied and summary judgment entered for each of the Defendants.

C.   **Sandmann cannot offer an expert linguist to contradict his own testimony about the facts and the video evidence.**

Finally, rather than address the specifics of his own testimony, or offer testimony from Phillips or any alleged "companion," Sandmann offers the testimony of a linguist, Dr. Craige Roberts, who purports to reconstruct what happened on January 18 and offers her interpretation of the truth of Phillips' statements based solely on her watching videos. (Motion at 19-22.) As an initial matter, Dr. Roberts' testimony only lends further support to Defendants' Motion for Summary Judgment because she testified that the Blocking Statements expressed Phillips' opinion. (Deposition of Craige Roberts ("C.R.") at 84:7-17 ("So Phillips statement seems to you, to be his conjecture that Sandmann intended to block him, right? A: That is his interpretation of the situation. That's the way he represents it. Q: So it's his conjecture, as you say? A: That's the best understanding I have of it, yes."); C.R. 90:3-5 ("Q: You are not disputing that that may be

Mr. Phillips' opinion, right?  A:  I am not disputing it.").)  Nonetheless, as set forth in Defendants' concurrently filed Motion to Strike, Dr. Roberts' testimony and opinions are patently inadmissible.

Among many other deficiencies, what is self-evidently improper about offering Dr. Roberts' opinions is that they are expressly premised on disregarding Sandmann's testimony, including his testimony about the videos she purports to opine on.  (C.R. 82:8-18 ("I didn't even finish reading the Sandmann deposition.  I decided that it would be a waste of their time and money for me to do that.").)  Not surprisingly, Dr. Roberts' interpretations of videos often conflict with Sandmann's own.

For example, to try to support the assertion that Phillips instigated a confrontation with Sandmann, the Motion asserts that when Phillips first approached he "nearly walked past" Sandmann, then supposedly stopped and turned back to "confront" him.  (Motion at 7; *id.* at 23 ("Phillips almost passed Sandmann, but then he stopped, moved back, and moved directly in front of Sandmann").)  Sandmann's claim that Phillips "nearly walked past" Sandmann is taken *verbatim* from Dr. Roberts' opinions, (C.R. 167:17-169:9); indeed Dr. Roberts' testimony (and a mere five seconds of video her testimony cites in purported support of it) is the *only* source Sandmann cites to bolster that claim.  Dr. Roberts's interpretation reflects her opinion that Phillips was never walking in the direction of the Lincoln Memorial when he was walking through the students, but rather only faced the Memorial for the first time to look at Sandmann. (C.R. 164:17-169:17.) But that "opinion" flatly contradicts Sandmann's sworn testimony (not to mention any rational review of the videos). (Video 10 at 0:12-26; S.D. 161:3-24 ("Q: And in this video [Video 10 at 0:12-0:26], the direction he's moving in is towards the Lincoln Memorial, right? A: Right.").)[6]

---

[6]Likewise, Dr. Roberts opined that "Sandmann did not move from where he had been standing prior to Phillips' approach," not even "an inch," (C.R. 203:25-204:15), and the Motion adopts that opinion as well.  (Motion at 16.) But Sandmann acknowledges the video shows that he did move just as Phillips approached, and even Sandmann's quibbles about how far he moved contradicts Dr. Roberts.  (S.D. 245:22-248:8 ("I moved six inches at most.").)

Sandmann's efforts to use Dr. Roberts' opinion to contradict his own prior testimony is an attempted end run around the Sixth Circuit's "sham affidavit rule." *See, e.g.*, *McClain v. Mason County, KY*, 618 F. App'x. 262, 266 (6th Cir. 2015). Under that "well-established" principle, *id.*, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Some courts have applied that principle to expert testimony which contradicts a party's own prior statements. *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 736 (2d Cir. 2010). As set forth in Defendants' Motion to Strike, Dr. Roberts' opinions are inadmissible for so many other reasons that this Court likely need not address whether that doctrine applies here. Nonetheless, the fact that just a week after his deposition Sandmann retained an expert to offer testimony to contradict his own deposition speaks volumes. The undisputed and admissible evidence in the record requires that his Motion be denied, and that summary judgment be entered for the Defendants.

## CONCLUSION

For all these reasons, as well as the reasons set forth in the separate summary judgment memoranda filed by each Defendant, each of the Defendants respectfully requests that the Court deny Sandmann's motion for partial summary judgment and instead grant Defendants' respective motions for summary judgment.

Dated: February 11, 2022

Respectfully submitted,

Nathan Siegel (*pro hac vice*)
Meenakshi Krishnan (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1301 K St NW, Suite 500
Washington, DC 20005
Phone: (202) 973-4237
Fax: (202) 973-4437
nathansiegel@dwt.com
meenakshikrishnan@dwt.com


*/s/ Robert B. Craig*
Robert B. Craig (KBA 15590)
TAFT STETTINIUS & HOLLISTER LLP
50 East RiverCenter Blvd.
Suite 850
Covington, KY 41011-1683
Ph: (859) 547-4300
Fax: (513) 381-6613
craigr@taftlaw.com


*Counsel for Defendants ABC News, Inc., ABC News Interactive, Inc., and The Walt Disney Company*


*/s/ Darren W. Ford*
John C. Greiner (*pro hac vice*)
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-2734
Fax: (513) 333-4316
jgreiner@graydon.law

J. Stephen Smith (KBA 86612)
Darren W. Ford (KBA 95373)
GRAYDON HEAD & RITCHEY LLP
2400 Chamber Center Drive
Suite 300
Ft. Mitchell, KY 41017
Phone: (859) 578-3070
Fax: (859) 578-3071

ssmith@graydon.com
dford@graydon.com

*Counsel for Defendant The New York Times*
*Company d/b/a The New York Times*

*/s/ Natalie J. Spears*
Jared A. Cox
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Suite 3500
Louisville, KY 40202
Phone: (502) 589-4200
Jared.cox@dentons.com

Jessica Laurin Meek (*pro hac vice*)
DENTONS BINGHAM GREENEBAUM LLP
10 West Market Street, Suite 2700
Indianapolis, IN 46204
Phone: (317) 635-8900
Jessica.meek@dentons.com

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
Phone: (312) 876-8000
Natalie.spears@dentons.com
Gregory.naron@dentons.com

*Counsel for Defendants CBS News, Inc.,*
*ViacomCBS, Inc., and CBS Interactive, Inc.*

*/s/ Michael P. Abate*
Jon L. Fleischaker
Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
 710 W. Main St., 4th Floor
Louisville, KY 40202
(502) 540-8280
jfleischaker@kaplanjohnsonlaw.com
mabate@kaplanjohnsonlaw.com

Michael J. Grygiel (admitted *pro hac vice*)
Cyndy E. Neidl (admitted *pro hac vice*)
Kelly L. McNamee (*admitted pro hac vice*)

GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1400
grygielm@gtlaw.com
neidlc@gtlaw.com
mcnameek@gtlaw.com

*Counsel for Gannett Co., Inc. and Gannett Satellite Information Network, LLC*

*/s/ Kevin T. Shook*
Kevin T. Shook *(pro hac vice)*
FROST BROWN TODD LLC
10 West Broad Street
Columbus, OH 43215
Phone: (614) 464-1211
Fax: (614) 464-1737
kshook@fbtlaw.com
Theresa A. Canaday
Samuel W. Wardle
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202
Phone: (502) 589-5400
Fax: (502) 587-1087
tcanaday@fbtlaw.com
swardle@fbtlaw.com

Michael E. Nitardy
FROST BROWN TODD LLC
7310 Turfway Road, Suite 210
Florence, KY 41042
Phone: (859) 817-5900
Fax: (859) 283-5902
mnitardy@fbtlaw.com

Ryan W. Goellner *(pro hac vice)*
FROST BROWN TODD LLC
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
Phone: (513) 651-6800
Fax: (513) 651-6981
rgoellner@fbtlaw.com

*Counsel for Defendants Rolling Stone, LLC and
Penske Media Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2022, I electronically filed the foregoing DEFENDANTS' JOINT RESPONSE IN OPPOSITION TO NICHOLAS SANDMANN'S MOTION FOR PARTIAL SUMMARY JUDGMENT via the CM/ECF system, which will send notice of filing to all parties of record.

*/s/ Natalie J. Spears*
Natalie J. Spears